[No. S026872. Jan. 6, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFREDO REYES VALDEZ, Defendant and Appellant.

## Counsel

Marilee Marshall, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene Honnaka and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MORENO, J.**—A jury convicted defendant Alfredo Reyes Valdez of the first degree murder of Ernesto Macias (Pen. Code, § 187, subd. (a))[1] and of escape from custody (§ 4532, subd. (b)). The jury found true the special circumstance allegation that the murder was committed while defendant was engaged in the commission of a robbery (§ 190.2, subd. (a)(17)) and that defendant personally used a firearm (§§ 12022.5, subd. (a), 1203.06,

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

subd. (a)(1)). The jury also found true that defendant had previously suffered three serious felony convictions. (§ 667, subd. (a).) After a penalty trial, the jury returned a verdict of death. This appeal from the resulting judgment is automatic. (§ 1239.)

We affirm the judgment in its entirety.

## I. FACTS AND PROCEEDINGS

At approximately 3:15 a.m. on Sunday, April 30, 1989, the body of Ernesto Macias was found lying on a curb a few houses from his home. He had been shot from close range multiple times in the head and upper body. One of the pockets of his pants was turned inside out, and bloodstains were discovered on the interior of that pocket. His jewelry was undisturbed and approximately $80 was found in his other pocket. Defendant was the last person seen with the victim.

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

##### a. *The Crime*

The victim lived in Pomona in a house he shared with his cousin Arturo Vasquez. Vasquez and his friend, Rigoberto Perez, spent the day—a Saturday—prior to the murder at the house drinking beer. Later that night, Gerardo Macias (Macias) arrived at the victim's house to pick up Perez, who was his cousin.[2]

Macias testified that upon entering the house, the victim, Perez, Vasquez, and defendant were in the small living room, which also functioned as the bedroom. The victim was lying on a mattress, covered with blankets, and had a Jennings .22-caliber semiautomatic handgun at his side. Perez was lying on a second mattress, with Vasquez sitting next to him. Defendant was standing near the front door. Awake and relaxing, the victim said he wanted to go to sleep because he was leaving early in the morning to catch a plane to Mexico to attend his sister's wedding. He said he was taking $3,000 with him. Defendant was present during this conversation.

Macias drank one or two beers after his arrival, and had been drinking beer earlier in the day as well. Approximately 10 minutes after Macias's arrival, at

---

[2] Perez lived with Macias at Macias's mother's house. Macias also was related to the victim, although distantly.

Vasquez's suggestion, Vasquez, Macias, and Perez drove to the nearby house of a friend, Andreas "Pato" Gutierrez to "party." As they were leaving the house, Macias heard the victim tell defendant in Spanish, using a "kind of mad" voice, to wait outside. Macias did not see defendant leave the house.

It took the three men approximately one minute to travel to Gutierrez's house. Finding that Gutierrez was preparing to go to sleep, they returned to the victim's house to drop off Vasquez. The round trip took approximately 10 minutes. Macias drove into the driveway of the victim's house and Vasquez got out of the car. Vasquez walked up to the front door, opened it, and noticed a lot of blood inside. He yelled, "Hey, hey," and Perez got out of the car and joined Vasquez at the door. Visibly frightened, they ran back to the car and told Macias that they had seen "all kinds of blood." Because it was the victim's house, and the gun had been near the victim when the three men last saw him, they thought the victim might have shot defendant.

The three men proceeded to drive around the area looking for the victim and defendant. After quickly checking with the victim's cousin, who lived "down the street," Macias drove around the block a couple of times, and then noticed a bloody body lying on the curb a few houses away from the victim's house. Macias was unable to identify the body, but Vasquez recognized it as the victim. Macias drove around the block to a telephone booth, dialed 911, and reported the location of the body. He then drove Vasquez to Gutierrez's house, drove himself and Perez home, and did nothing further. He testified that he did not wait for the police because he was frightened and had outstanding arrest warrants.

> b. *The Crime Scene*

Pomona Police Sergeant David Johnson entered the victim's house with two other officers and observed "blood everywhere."

A broken trail of blood and bloody bare footprints led from the victim's front concrete porch to the victim's body. The victim was not wearing shoes and his feet were bloody. Detective Frank Terrio surmised that the victim left the bloody footprints when he walked out of his house bleeding to death. The victim's left pants pocket was turned inside out and there were bloodstains on the interior of the pocket. He was wearing jewelry and approximately $80 was found in his undisturbed, right pants pocket.

Detective Terrio also observed two different shoe prints made in blood on the concrete porch outside the victim's house. It was clear that the same shoe did not make both prints. One of the shoe prints was only a partial print of the midsole area, and therefore it could not be determined if it was made

while the person was entering or leaving the house. This print was consistent with those made by Adidas jogging shoes or Nike walking shoes. The larger shoe print indicated that it was made while the person was leaving the house. Detective Terrio testified on cross-examination that the two shoe prints were consistent with two people leaving prints in blood. He also surmised that any officer at the scene could have left one of the prints, but noted that officers generally do not wear tennis shoes to crime scenes. A police work boot, however, exists that has a pattern similar to the one found on the porch.

Detectives searched the victim's house and discovered a Jennings .22-caliber semiautomatic handgun underneath the kitchen sink. They did not find a wallet, money, plane tickets, or a bank savings book.

One expended .22-caliber long rifle cartridge casing was found in the victim's house, along with one .22-caliber "Super X" long rifle cartridge and one .25-caliber cartridge. The Jennings .22-caliber handgun fires .22-caliber long rifle ammunition and holds a total of seven rounds.

### c. *The Investigation*

The prosecution introduced evidence that on January 12, 1989, 1988 state and federal tax forms were prepared for the victim, requesting a federal tax refund of $1,203. On Friday, April 28, 1989, two days before the murder, a United States Treasury check for $1,203 payable to the victim was cashed at a Bank of America branch office in Pomona. Given the bank's policy requiring two forms of identification to cash a check, a bank manager opined that the victim cashed the check. A police check and credit fraud expert compared signatures on the victim's Department of Motor Vehicles handwriting exemplar with that on the Treasury check. The analysis was inconclusive, but similarities existed as to the signatures.

An autopsy revealed that the victim was shot four times. An entry wound just below the victim's left eye likely was fatal, and a wound below the right ear indicated that the victim had been shot from less than 18 inches away. It was possible that the victim sustained the injuries inside the house and collapsed some distance away.

Unrelated to the murder investigation, in the early morning hours of May 1, 1989, approximately 24 hours after the murder, Pomona Police Lieutenant Larry Todd was monitoring a group of individuals who were suspected of preying on people visiting certain convenience stores. He observed the group near a Monte Carlo automobile parked outside one of the targeted convenience stores. Intending to warn the occupants of the vehicle about the group, Lieutenant Todd drove up to the Monte Carlo. As he did this, the driver of the

vehicle got out and walked to the front of the vehicle. Lieutenant Todd got out of his patrol vehicle and walked toward the driver. When he approached the driver's side door he spotted a small-caliber gun protruding from under the front seat of the car. He pulled out his weapon and ordered the driver and defendant, who was standing next to the passenger side door, to stand still.

Lieutenant Todd called for assistance and was joined by Officer Joseph Pallermino. Officer Pallermino seized the gun, a Jennings .22-caliber semiautomatic handgun, and a magazine containing bullets, from the driver's side interior of the car. The three bullets seized consisted of two "Super X" .22-caliber long rifle cartridges, and one "Federal" .22-caliber long rifle cartridge. Officer Pallermino also noticed dried blood on the grip of the gun. The defendant and the driver of the car, who was identified at trial only by the name of Morales, were arrested.[3] When defendant was booked, he had $100 in cash on his person. It was stipulated that defendant was unemployed at the time.

Seven "Super X" .22-caliber long rifle cartridges, along with one "Federal" .22-caliber long rifle cartridge, were subsequently found in the Monte Carlo.

Detective Terrio, who is a latent print expert, examined a bloody palm print that was detected on the left side of the grip of the Jennings .22-caliber handgun found in the Monte Carlo and compared it to defendant's palm print. In Detective Terrio's opinion, the latent palm print was made by defendant, and could only have been made when the blood was wet. On cross-examination, Detective Terrio stated that he could not determine the age of the print, and agreed that defendant's palm print might have gotten on the grip of the gun without defendant's gripping the gun while shooting it. Deputy Sheriff Linda Arthur, a latent fingerprint expert with the Los Angeles County Sheriff's Department, opined but was not sure that the palm print was from a left hand.

Serologist Richard Catalani examined the blood on the grip of the Jennings .22-caliber handgun found in the Monte Carlo and compared it to blood from the victim and defendant. Catalani opined that the blood on the gun could not have come from defendant, but that it was consistent with the victim's blood type. He added that approximately 16.4 percent of the population has the same phosphoglucomutase subtype as the blood found on the gun.

Criminalist James Roberts examined the bullets removed from the victim's body to determine whether they could have been fired from the Jennings

---

[3] Officer Pallermino was unable to recall during direct examination where defendant was located when he arrived at the scene, and on cross-examination whether defendant was the driver or even in the vehicle. However, on recross-examination, Officer Pallermino agreed with defense counsel that Morales was the driver, not defendant.

.22-caliber handgun found in the Monte Carlo or the identical Jennings .22-caliber handgun found in the victim's kitchen. He stated that he was unable to conclusively link the bullets to either gun because the bullets could have been fired from any Jennings .22-caliber semiautomatic handgun.

### d. *Defendant's Statements*

On April 19, 1990, about a year after the murder, Pomona Police Detectives Allen Maxwell and Greg Collins interviewed defendant. Defendant waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], but refused to allow the interview to be tape-recorded.

Defendant stated that he was at the victim's house around the time the victim was killed, and recalled that there were three other people in the house that evening. He went to the victim's house "quite often" to buy drugs, but he did not buy any that night because the victim said he did not have any drugs to sell. Initially, defendant said he left the victim's house shortly after the other three men left, but then said he left the house at the same time as the others. He said he argued with the victim as to whether he should leave, but their argument was not violent. Defendant stated he did not have a gun while he was at the house.

Defendant told the officers that the day after the murder, he went to a convenience store to buy beer. When he came out of the store, officers were detaining Morales. Feeling that he had nothing to fear, he walked up to the car and was subsequently arrested.

When questioned further about the Monte Carlo, defendant gave contradictory answers as to how he and Morales obtained the car. Defendant first said he went with Morales to the apartment of the owner of the Monte Carlo, and even though the owner did not like him, the owner lent them his car. Defendant then said Morales went to the owner's apartment, borrowed the Monte Carlo, drove around the corner, picked up defendant, and the two of them drove around looking for drugs.

Defendant told the detectives that he did not know there was a gun in the Monte Carlo and did not know how his bloody print got on the gun. He said he never touched the gun.

When questioned about inconsistent and confusing statements he made during the interview, such as how he and Morales obtained the Monte Carlo, defendant became "[d]efensive [and e]xtremely agitated." The interview ended when defendant became upset over questioning regarding both his inconsistent statements and his print on the gun found in the Monte Carlo.

### e. *The Escape*

On April 8, 1991, while in custody on unrelated charges, defendant appeared in court and pleaded not guilty to the murder and special circumstance charges. While being escorted back to "lock up" in a "four-man chain," defendant broke free from his handcuffs and fled out of the courthouse. Deputy marshals and sheriffs pursued him and subsequently found him hiding in a women's bathroom in a building across the street.

### 2. *Defense Evidence*

Defendant did not testify.

Vasquez testified that on the day prior to the murder, the victim was at home around 11 a.m. That day, or a day earlier, he loaned a gun to Gutierrez that was identical to the Jennings .22-caliber caliber handgun found at the victim's house under the kitchen sink and the one seized from the Monte Carlo. Sometime in the afternoon, the victim, carrying a suitcase, left to catch a flight to Mexico. He told Vasquez he was going to his brother Roberto's house and that Roberto was going to take him to the airport. Vasquez spent the afternoon drinking beer at the house with Perez and Gutierrez.

The victim unexpectedly returned home at approximately 9 p.m. Vasquez did not see the victim with a plane ticket, a wallet, cash, or luggage upon his return. Nor did he notice a bulge in the victim's pants pockets.

Later that night, Gutierrez arrived at the house, and for the next hour or so, the victim, Vasquez, and Gutierrez drank beer and talked. Gutierrez went home after approximately one hour. Defendant, who was Vasquez's friend, arrived at the victim's house sometime after Gutierrez left. Approximately 10 minutes after defendant's arrival, Macias and Perez arrived,[4] and were a "little bit drunk."

Vasquez never heard the victim brag about having large sums of money or discuss his trip to Mexico. The victim and defendant were friendly to each other and did not argue. Vasquez, however, admitted on cross-examination that he concentrated more on a television program than on the conversation between the victim and the others, and further admitted he was a "little drunk."

Defendant remained in the house when the three men left. At the time, the victim was wrapped in a blanket on his mattress near the television and defendant was sitting next to Vasquez's mattress.

---

[4] This testimony conflicted with Macias's testimony that he went to the victim's house to pick up Perez.

Vasquez, like Macias, testified that the trip to Gutierrez's house was short, both spatially and temporally, and that they returned to the victim's house because Gutierrez was preparing to go to bed. His testimony was also consistent with Macias's testimony regarding the discovery of the victim's body.

It was stipulated that: (1) defendant was right-handed; (2) if the victim's brother were called to testify, he would say the victim gave a gun to Gutierrez on the evening of April 29, 1989; and (3) Gutierrez owed the victim about $250 and the victim needed the money "so that he could attend a wedding in Mexico and have more money with him."

The defense also introduced evidence that on April 14, 1989, approximately two weeks before the murder, nine cases of Jennings .22-caliber semiautomatic handguns, a total of 324 guns, were stolen from a truck in Pomona. The guns found in the Monte Carlo and in the victim's kitchen were among the stolen guns.

Detective Greg Guenther was called by the defense. He testified that he arrived at the crime scene at approximately 3:30 in the morning, and while surveying the scene, he noticed shoe impressions left in dry dirt in the side yard of the victim's house. The impressions seemed to lead toward the alley north of the victim's house. Detective Guenther pointed out that the prints did not seem to originate from the porch area because there was a gap between the porch and where the prints began. He further opined that anyone walking in the area could have left the shoe prints. He did not try to make a visual comparison of the prints left in the dirt to the prints that were left on the concrete porch.[5]

At some point later in the investigation, Detective Guenther became aware of witness statements indicating that the victim had given a gun to Gutierrez. But he stated that there were no reports of any search or attempted search of Gutierrez's house in pursuit of that gun.

B. *Penalty Phase*

1. *Prosecution Evidence*

The prosecution presented evidence that defendant was convicted of aggravated robbery in Texas on January 28, 1983, and was convicted in California of five counts of first degree residential burglary on August 3, 1983.

---

[5] The prosecution subsequently called Detective Terrio on rebuttal regarding the shoe impressions in the side yard. He testified that the yard functioned as an access area and there was evidence of a lot of foot traffic, but "there was no fresh footprint evidence or anything that seemed significant."

In addition, the prosecution presented evidence that defendant committed four violent acts while in prison and jail. The first incident occurred on May 8, 1984, at Deuel Vocational Institution in Tracy, California. Correctional Officer Steven Espinoza observed an inmate, who was wearing a black bandana, stab a fellow inmate while another inmate held the victim. Once the victim fell to the ground, the inmates walked across the prison yard and mingled with another group of inmates who were lined up against a wall as a result of an alarm sounding. Officer Espinoza approached the group of inmates and noticed that defendant was wearing a black bandana. He took and reported defendant's prison number. Officer Espinoza, however, could not positively identify defendant as the assailant and he did not know if defendant was charged, disciplined, or reprimanded for the stabbing. The victim suffered head injuries and stab wounds, and had blood coming out of his ear.

Two "inmate manufactured stabbing weapons" were subsequently found under a pallet near the wall where defendant and the other inmates were standing. Officer Donald Karvonen also discovered a bloody "state jacket" and sweatshirt in the yard. Although he testified that two inmates were the subject of a disciplinary report, he did not believe anyone was found culpable.[6]

The second incident occurred on September 22, 1984, in Soledad Prison. Correctional Officers Steve Valentine and Michael Wright observed defendant chasing another inmate with a metal baseball bat. Defendant ignored Officer Valentine's order to drop the bat, and instead continued chasing the other inmate. Officer Valentine called for assistance and then chased after defendant and the other inmate. Defendant eventually stopped running and threw the bat down after Officer Wright, who was working as a tower gunman, "chambered" his weapon as a warning, and ordered defendant to stop running and to drop the bat. While defendant was not observed striking the inmate, the bat was held in a raised position, and Officer Wright believed defendant was going to strike the inmate. Defendant told Correctional Officer Donald Polanshek, who investigated the incident, that he would have beaten to death the other inmate had he caught him because the inmate had disrespected him.

The third incident occurred on March 10, 1991, while defendant was in jail in Los Angeles. Defendant approached fellow inmate Javier Rodriguez, took a bag containing $80 from Rodriguez's neck, and with the help of other

---

[6] Defendant cites Officer Karvonen's testimony for the assertion that, at a hearing, defendant was found not to be responsible for the stabbing. Officer Karvonen, however, only testified that he could not recall if any inmate was found culpable, although he believed, but was not positive, that no one was found culpable. Contrary to defendant's implication, Officer Karvonen did not testify that a hearing was conducted at which a finding was made that defendant was not culpable.

inmates assaulted Rodriguez. Defendant punched Rodriguez three times in the face with a closed fist, while the other inmates kicked him. Rodriguez identified defendant as one of his attackers.

The fourth incident occurred on October 21, 1991, while defendant was in county jail. Deputy Sheriff Douglas Shive observed defendant walk "straight towards" inmate William Robinson. Robinson looked "extremely scared," as he was backpedaling with his hands in the air. Deputy Shive intervened and searched defendant, finding a 10-inch shank in his pants pocket. While Deputy Shive was detaining defendant, defendant told him, "I don't have anything against you. I'm not after you." Deputy Sheriff John Whipple contacted Robinson at Deputy Shive's direction. He noticed blood on Robinson's T-shirt, as well as a bleeding puncture wound on the back of his arm and another puncture wound on his back.

The prosecution also presented evidence that on January 18, 1991, defendant met with Francisco Banuelos at defendant's apartment. Defendant told Banuelos that he had some tires he wanted to sell. Banuelos replied that he wanted to buy the tires, but because he only had $100 he would perhaps buy them the next day. Banuelos then agreed to give defendant a ride in his truck. When they reached their destination, they got out of the truck and walked toward a garage. At that point, defendant grabbed Banuelos by the hand, put a knife to his chest, and demanded that Banuelos give him the $100 and the keys to the truck. Banuelos handed defendant the money and keys and ran away.

Later that day, Pomona Police Officer Bradley Elliot spotted Banuelos's truck. Defendant was in the driver's seat. As the officer approached the truck, defendant and another man got out of the truck and ran. After a chase, defendant was caught and handcuffed following a 30- to 40-second struggle with three police officers.

With respect to the April 8, 1991, courtroom escape, the prosecution offered evidence that defendant kicked and struck Los Angeles County Deputy Sheriff John Guise when he attempted to apprehend defendant when he was hiding in the bathroom.

### 2. *Defense Evidence*

Nine witnesses testified for the defense. Eight of them were family members or friends and one witness was a retired correctional officer.

Defendant's father, Antonio Valdez, testified that defendant was born in Mexico and moved with his family to Pomona when he was 10 years old.

Defendant had two brothers and two sisters, but one brother died. Defendant dropped out of school at the age of 14 or 15 and worked with his father. Prior to dropping out of school, defendant worked part-time with his father. Mr. Valdez said defendant was a good worker. Defendant was also obedient and respectful to his parents. Mr. Valdez thought that perhaps defendant took the wrong path because life was very hard in Pomona. Mr. Valdez told the jury his wife was very ill and might die in a month or a year. He said that if defendant was sentenced to death, "I don't believe that my wife will live."

Rosa Valdez, defendant's mother, testified that the family was poor and she worked all of her life. She did not believe defendant committed the murder and asked the jury for "mercy for my son." Victoria Valdez, defendant's sister, testified defendant was helpful with her children and had not been a violent child. She asked the jury to sentence him to life without the possibility of parole. Defendant's other sister, Graciela Valdez, testified that defendant was not a violent person and felt that he should not be sentenced to death because she needed to speak to him for advice.

Leticia Belmar, defendant's aunt, lived in Mexico when defendant was born. As a child she took care of him on a daily basis. He was well behaved and attended church. She told the jury that when defendant was six or seven years old, he spent money that his mother had given him on toys for the baby Belmar was expecting. She testified further as to defendant's generous nature as a child and also told the jury that when defendant was eight years old, he saved a child from drowning. She did not want defendant to receive the death penalty.

Enedina Garcia and her husband, Jose Garcia, were defendant's friends. Enedina Garcia had known defendant and his family for 17 years, and said she had never seen defendant act violently. She was aware of defendant's prison record, but believed he became religious while in prison. She asked the jury to spare defendant from the "gas chamber."

Jose Garcia testified he had spoken with defendant about religion and that defendant had helped keep his children out of trouble. He stated he never observed defendant with a gun. He said that defendant should be sentenced to life without the possibility of parole.

Carolina Reyna, another close friend, testified that she did not think defendant was capable of killing anyone and never saw defendant behave in a violent manner. Even though defendant's father always yelled at him and his siblings, defendant listened and obeyed. She believed defendant could help others even if he remained in prison for the rest of his life.

James Park, a retired correctional officer with the California Department of Corrections, who once served as an associate warden at San Quentin,

described general housing conditions for inmates serving sentences of life without the possibility of parole. Park explained that an inmate sentenced to life without the possibility of parole would "most certainly go to one of the . . . four maximum security level 4 prisons." He testified that the security at these prisons was impregnable and that searches were conducted frequently to minimize possession and use of weapons. Prisoners who violate any rules are sent to security housing units and spend up to 23 hours a day in a cell. Park said that he opposed the death penalty. He had seen first hand the irrevocability of the gas chamber.

### 3. *Prosecution's Rebuttal*

Robert Leach testified that he had been working for the California Department of Corrections for 27 years. He was currently working in a level 4 maximum-security unit, but the prison itself was classified as a level 3/4. He stated that a person who is sentenced to life without the possibility of parole is given enough points to be housed in a level 4 unit. But a prisoner serving a sentence of life without the possibility of parole does not necessarily stay at level 4 throughout his stay in state prison. When an inmate seems to be doing well, the prisoner's points can drop and the prisoner can become a level 3 and enjoy all the advantages of that classification. In his experience, inmates frequently make weapons and assault each other.

It was stipulated that if Roger Kumar, defendant's parole agent, were called to testify, he would state that defendant's parole terminated on February 13, 1989, and that defendant remained unemployed throughout his almost 12-month parole period.

### II. GENERAL ISSUES

### A. *Denial of* Marsden *Motions*

Defendant contends that the trial court erred in denying his three separate motions (two pretrial and one during the penalty phase) for substitution of counsel under *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*). He claims that, as a result, he was denied his state and federal constitutional rights to effective assistance of counsel.

### 1. *The February 10, 1992 Hearing*

The first *Marsden* hearing occurred on February 10, 1992, after a year of representation and several weeks before the jury was seated. Defendant and his counsel met with the judge in chambers, outside of the presence of the district attorney. After explaining to the court his concerns with counsel,

including counsel's failure to (1) communicate with him about the case, (2) speak with numerous witnesses, and (3) file pretrial motions on his behalf, defendant stated: "I'd just like to ask if I could have a *Marsden* hearing on this matter because there's nothing—there is nothing being done on my case."

Counsel responded that he was ready to proceed to trial and described in detail the evidence that would be presented by the prosecution. He informed the court that he intended to file a motion under section 995 to set aside the indictment with respect to the robbery-murder special circumstance, and that he had informed defendant of his intention to file such a motion. Counsel stated that he would be able to interview local witnesses and related a discussion he had with defendant with respect to potential penalty phase witnesses residing in Texas and in Juarez, Mexico. Counsel informed the court that defendant had only recently mentioned these witnesses.

The judge asked defendant if he wanted counsel to investigate the people in Juarez, and defendant responded, "Yes, I do want him to." The judge then asked, "Is there anything else either side wants to put on the record now?" Counsel indicated that he intended to bring a motion in limine to bifurcate the murder charge from the escape charge.

The court then denied defendant's *Marsden* motion, stating that it found counsel was properly handling defendant's case. Defendant again argued that his counsel had not filed any motions. The court informed defendant that counsel made the ultimate determination whether or not to file certain motions. Again, defendant's *Marsden* motion was denied. Defendant told the court that he had met too infrequently with his counsel and that he wanted his counsel to interview additional witnesses. The court concluded the hearing by informing defendant that "capable counsel" was representing him.

### 2. *February 26, 1992 Hearing*

On February 24, 1992, defendant filed a 16-page handwritten *Marsden* motion claiming that he was "entering a conflict of interest" with his counsel. He claimed that his counsel "had ex-parte with D.A.," that there were "numerous" witnesses to be interviewed, that he had not seen his attorney as often as he had requested, that counsel "has made false statements to my relatives," that his attorney had not filed certain motions, that counsel "has been representing me on two other cases, and no motions [have] been declared," and that defendant had not met with the private investigator retained by his counsel.

Two days later, on February 26, the court held a hearing outside the presence of the district attorney. The court informed defendant that it had

read his motion and asked defendant if he had "any additional facts" supporting his motion or "if there is anything further that you wish to tell the court that's not contained in your motion?"

Defendant informed the court that he believed his counsel only began investigating the case because defendant informed counsel that he wanted a *Marsden* hearing. He reiterated complaints about counsel's performance that were raised in his brief and in his previous *Marsden* motion. The court asked defendant whether his attorney had contacted any witnesses to the 1989 shooting, and defendant stated that he believed that his attorney had not.

In response, counsel explained that he had investigated whether there were witnesses who heard the shots being fired. He noted, however, that this case was not brought until 1991, whereas the murder had occurred in 1989. As a result, it was difficult for neighbors to remember if they had heard shots. Counsel indicated that he had filed a motion under section 995 to dismiss the special circumstance allegation. Counsel stated that he found defendant's request for an identification expert to be meritless. Counsel acknowledged that he had discussed the case with the prosecutor out of defendant's presence, but that he did not believe such discussions were improper. He reassured the court that he was diligently working on the case and that he was prepared.

The court then gave defendant a chance to respond. Defendant argued that counsel had just begun locating potential penalty phase witnesses in Mexico and Texas and that he did not believe there was sufficient time to locate such witnesses. Trial counsel responded that he recently learned of such witnesses and that he had subsequently retained an investigator to interview several witnesses. The court denied the *Marsden* motion. After defendant inquired as to the reasons for the denial, the court replied, "There are no grounds that have been articulated to the court. The court has heard the evidence, heard your argument."

### 3. *March 27, 1992 Hearing*

During the penalty phase, after the prosecution had presented its case and defense counsel had examined four witnesses, defendant filed a two-page handwritten letter requesting a hearing outside the presence of the prosecutor. This request occurred after counsel informed the court that defendant intended to testify, against counsel's advice. In the letter to the court, defendant stated: "Before I go on with this case 'as of taking the stand' I'd like to give you a written testimony of this whole case." He began, "I did give you a few things to consider on a *Marsden* hearing! And as I did say my attorney didn't surround this case to his best." Defendant attempted to rebut the prosecution's penalty phase evidence. He concluded, "my testimony would consider

of letting the jury know how a life in prison can be. Out of 5 years I got in trouble only ones." In a "P.S." section, he wrote, "Can we have a meeting without the prosecutor !? being present?"

At the hearing, counsel responded to defendant's attempt in his letter to rebut the prosecution's penalty phase evidence. Counsel informed the court that he had discussed the various incidents with defendant. As a result of these conversations, in which defendant had admitted much of what the prosecutor was seeking to prove, counsel concluded that there was not much he could do because "the events basically took place in sum and substance." Defendant responded by denying the prosecutor's allegation that he had stabbed someone in county jail. At this point the following colloquy took place:

"The Court: Mr. Valdez, excuse me for just a minute. What's your motion? Is your motion one to relieve Mr. Robusto so that you can proceed to represent yourself in this matter?

"The Defendant: My thing here is that I didn't have witnesses.

"The Court: Have you given—All right. In regard to witnesses, have you given to Mr. Robusto or to his investigator the names or any identifying information whereby they could talk to any witnesses?

"The Defendant: This is short notice.

"The Court: I didn't ask you that. Have you done that?

"The Defendant: No, I haven't."

After a continued discussion about witnesses, the court again asked defendant why he requested a hearing.

"The Court: What's your specific motion? What do you want the court to do?

"The Defendant: Well, first of all, I asked for a mistrial on the detective. He got up there and mentioned about the prison to the jury, and I asked for a mistrial on that.

"The Court: We're not talking about that. You gave me a letter this morning. We're only talking about the contents of the letter. [¶] Why did you give me the letter? What did you do you want the court to do?

"The Defendant: I wanted the court to take into consideration that I haven't had a fair trial in this, that I didn't have the surrounding of this case, the defense that I was supposed to have.

"The Court: That motion is denied. The court finds quite to the contrary, that you have had one of the best defenses that this court has seen, that the comments raised in your letter that's been identified as number 66 are incorrect, that they are misleading and insufficient."

### 4. *Analysis*

The governing legal principles are well settled. "Under the Sixth Amendment right to assistance of counsel, ' " '[a] defendant is entitled to [substitute another appointed attorney] if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " ' [Citation.] Furthermore, ' " 'When a defendant seeks to discharge appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.' " ' " (*People v. Welch* (1999) 20 Cal.4th 701, 728 [85 Cal.Rptr.2d 203, 976 P.2d 754]; see also *Marsden, supra,* 2 Cal.3d at pp. 124–125.) " '[S]ubstitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel.' [Citations.]" (*People v. Hart* (1999) 20 Cal.4th 546, 603 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

"A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' " (*People v. Welch, supra,* 20 Cal.4th at pp. 728–729.)

At the first two *Marsden* hearings, on the 10th and 26th of February 1992, the trial court afforded defendant the opportunity to set forth his complaints regarding his representation by counsel. Defendant argues that the trial court conducted a "feeble and incomplete inquiry." We disagree. The record demonstrates that the court provided defendant with ample opportunity to detail his concerns and state the grounds for his motion. After hearing defendant's complaints, the trial court allowed counsel to respond. Trial counsel addressed defendant's specific concerns by describing what he had done in the case and what he planned to do. Although counsel did not agree

with all of defendant's suggestions, he maintained that he was prepared to go to trial and would be able to work with defendant to address his concerns. As we have said, "When a defendant chooses to be represented by professional counsel, that counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." (*People v. Carpenter* (1997) 15 Cal.4th 312, 376 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

It is clear from the record that the trial court conducted a sufficient inquiry during both of the pretrial *Marsden* hearings. (See *People v. Silva* (2001) 25 Cal.4th 345, 367 [106 Cal.Rptr.2d 93, 21 P.3d 769] (*Silva*).) As we have said, "a *Marsden* hearing is not a full-blown adversarial proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement." (*People v. Hines* (1997) 15 Cal.4th 997, 1025 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Defendant additionally argues that the trial court relied on an incorrect standard in ruling on the *Marsden* motions. We disagree. The record amply supports the trial court's conclusion that counsel's representation was adequate and that there was no irreconcilable conflict between defendant and his counsel. Defendant complained at both hearings that he had not been able to speak with counsel as often as he would have liked. However, " '[t]he number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence.' [Citation.]" (*People v. Hart, supra,* 20 Cal.4th at p. 604.) At the first hearing, defendant complained that his counsel had failed to locate and interview potential penalty phase witnesses in Juarez, Mexico, and in Texas. By the time of the second hearing, counsel had retained an investigator to locate and interview such witnesses. The record supports the trial court's conclusion that defendant failed to make a substantial showing of conflict.

In sum, we find no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in declining to substitute counsel.

Defendant contends that the third hearing, which took place during the penalty phase on March 27, 1992, did not satisfy his request for a *Marsden* hearing. We conclude that the court was under no duty to hold a *Marsden* hearing. Defendant's letter to the judge merely indicated that he desired to meet with the judge out of the presence of the prosecutor. It did not state the basis for this request. The trial court, after granting defendant's request, repeatedly asked defendant why he had requested the hearing. The trial court specifically asked defendant if his "motion [was] one to relieve [counsel] so

that you can proceed to represent yourself in this matter." Defendant did not respond in the affirmative; in fact, during the entire course of the hearing defendant neither requested a *Marsden* hearing by name nor did he ask for counsel to be replaced. Instead, defendant merely complained about his defense and argued that additional witnesses should be questioned.

"Although no formal motion is necessary, there must be 'at least some clear indication by defendant that he wants a substitute attorney.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150], quoting *People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8 [247 Cal.Rptr. 1, 753 P.2d 1052].) "The mere fact that there appears to be a difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing." (*Lucky,* at p. 281.) Here, defendant did not indicate that he wanted to replace his attorney, even when asked directly by the trial court. While a defendant need not specifically request a *Marsden* hearing by name, we note that this defendant was capable of doing so.

Since we conclude that defendant's comments were insufficient to indicate that he was requesting a *Marsden* hearing, "the trial court was under no obligation to conduct an inquiry into any dissatisfaction defendant might have with his appointed counsel so as to necessitate substitution of counsel." (*People v. Mendoza, supra,* 24 Cal.4th at p. 157.)

Moreover, even were we to find that defendant had requested a *Marsden* hearing, we find that the trial court conducted a sufficient inquiry and acted within its discretion in declining to replace appointed counsel. The court allowed defendant to state his concerns, permitted counsel to respond, and concluded that defendant "had one of the best defenses that this court has seen" and that defendant's complaints were "misleading and insufficient."

B. *Denial of* Faretta *Motion*

Defendant alleges that he was denied his right to represent himself, in violation of the Sixth Amendment to the United States Constitution. He asserts that he made two timely, unequivocal requests to represent himself under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*), and that even if his second request was untimely, the trial court abused its discretion in failing to make an adequate inquiry under *People v. Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187] (*Windham*).

A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely

request after having been apprised of its dangers. (*Faretta, supra,* 422 U.S. at p. 835; *People v. Welch, supra,* 20 Cal.4th at p. 729; *People v. Hines, supra,* 15 Cal.4th at p. 1028; *People v. Clark* (1992) 3 Cal.4th 41, 98 [10 Cal.Rptr.2d 554, 833 P.2d 561].) *Faretta* error is reversible per se. (*People v. Dent* (2003) 30 Cal.4th 213, 217 [132 Cal.Rptr.2d 527, 65 P.3d 1286] (*Dent*), citing *McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8 [79 L.Ed.2d 122, 104 S.Ct. 944].)

1. *February 10, 1992 Statement*

Defendant contends his first request for self-representation occurred on February 10, 1992, immediately following the denial of his first *Marsden* motion. As described above, after the trial court denied defendant's *Marsden* motion, defendant continued to complain that his counsel's representation was inadequate. The court informed defendant that it was not going to get involved in managing the relationship between defendant and his attorney and stated: "I am not going to get into the issue of what he should or shouldn't tell you. I don't think that's appropriate." Defendant responded, "Well, in this matter I am—my constitutional rights if I want to go pro. per. on this case I could do that."

The court responded, "I wouldn't let you go pro. per. on this case. For one thing you just told me not more than 10 minutes ago that you are unable to represent yourself. [¶] I have serious doubt about your ability to represent yourself in the other matters, but I am not going to take that issue up at this time. [¶] I do know that on just my conversations with you relative to this capital case suggest to me that you do not have the ability to knowledgeably, meaningfully represent yourself on that case and you are very appropriately represented by counsel and competent counsel." The court then concluded the hearing and the case was transferred to Judge Nuss for trial.

Defendant alleges that his statement was an unequivocal motion to represent himself, and argues that the court's failure to conduct a hearing into his ability to represent himself and its refusal to entertain the possibility that defendant had the ability to represent himself violated his Sixth Amendment rights.

We have emphasized the importance of an unequivocal request for self-representation. "The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion

for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*People v. Marshall* (1997) 15 Cal.4th 1, 23 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*).) Moreover, the *Faretta* right is forfeited unless the defendant " 'articulately and unmistakably' " demands to proceed in propria persona. (*Id.* at p. 21, quoting *United States v. Weisz* (D.C. Cir. 1983) 718 F.2d 413, 426; see also *Dent, supra,* 30 Cal.4th at p. 218.)

It is clear from the record that defendant's statement was not an articulate and unmistakable demand for self-representation. After the trial court denied defendant's first *Marsden* motion, defendant said, "[I]f I want to go pro. per. in this case I could do that." Defendant's use of the conditional "if" shows that his statement was ambivalent and equivocal. (*People v. Hines, supra,* 15 Cal.4th at p. 1028 [concluding that a defendant who used the word "if" never made an unequivocal assertion of the right to self-representation].) In addition, the fact that defendant made only a single reference to the right to self-representation, immediately following the denial of his *Marsden* motion, further supports the conclusion that defendant did not make an unequivocal *Faretta* motion. As we stated in *People v. Barnett* (1998) 17 Cal.4th 1044, 1087 [74 Cal.Rptr.2d 121, 954 P.2d 384], "defendant's single reference to 'mak[ing] a motion to proceed pro se' is properly viewed as an 'impulsive response' to the magistrate's refusal to immediately consider his *Marsden* request. As such, it did not constitute an unequivocal assertion of the right to self-representation. (*Jackson v. Ylst* (9th Cir. 1990) 921 F.2d 882, 888 [self-representation request deemed an equivocal, emotional reaction to the trial court's denial of a motion for substitute counsel] . . .)." Because defendant failed to " 'articulately and unmistakably demand to proceed *pro se*,' " we conclude he never invoked his *Faretta* right. (*Marshall, supra,* 15 Cal.4th at p. 21; *Dent, supra,* 30 Cal.4th at p. 218.)

We additionally reject defendant's argument that the court recognized that defendant's statement was a *Faretta* motion and rejected it as such when it stated, "I wouldn't let you go pro. per. on this case." It appears from the record that the court viewed defendant's statement as an impulsive and equivocal response to the court's rejection of his *Marsden* motion. Even if the court did treat defendant's statement as an assertion of his right to represent himself, we are not bound by such a determination. "A reviewing court, in determining whether a motion for self-representation is unequivocal, is not bound by the trial court's apparent understanding that the defendant was making a motion for self-representation." (*People v. Barnett, supra,* 17 Cal.4th at p. 1087, citing *Marshall, supra,* 15 Cal.4th at pp. 23–25.) As explained above, it is clear from the record that defendant never made an unequivocal assertion of his right to self-representation, and therefore, the trial court did not err in declining to consider such a request.

This case is distinguishable from *Dent, supra,* 30 Cal.4th 213, in which we reversed the defendant's conviction because of *Faretta* error. In *Dent,* after the trial court informed the defendant that the court was going to replace his trial counsel, the defendant's counsel informed the court that if counsel were replaced, the defendant would like to "proceed in pro. per." (*Id.* at p. 217.) The trial judge stated: "I am not going to let him proceed pro. per. . . . Not in a death penalty murder trial." The defendant responded, "[I]f I receive two new counsel, I would like to go pro. per." (*Ibid.*) The court ignored this statement, dismissed counsel, and subsequently appointed new counsel. The defendant did not renew his *Faretta* request.

We concluded the trial court denied the defendant's *Faretta* motion on an improper basis—the request was denied because the case was a " 'death penalty murder trial.' " (*Dent, supra,* 30 Cal.4th at p. 218.) While the Attorney General contended that the defendant's statement was equivocal, and therefore a proper *Faretta* motion was never made, we held that "whether or not defendant's request was equivocal, the trial court's response was not only legally erroneous but unequivocal, and foreclosed any realistic possibility defendant would perceive self-representation as an available option. Thus, even assuming defendant's request was equivocal, the trial court's response effectively prevented defendant from making his invocation unequivocal." (*Dent,* at p. 219.)

Unlike in *Dent,* defendant's statement was ambiguous and cannot be deemed to have constituted an articulate and unmistakable demand for self-representation. (*Marshall, supra,* 15 Cal.4th at p. 21; *Dent, supra,* 30 Cal.4th at p. 218.) Further, while it is generally improper for a trial court to categorically state, "I wouldn't let you go pro. per. in this case," in response to a defendant's first mention of the possibility of self-representation, here there is no reason to conclude defendant did not renew his request because he believed it would be futile. In *Dent,* we noted that aside from the colloquy quoted above, the trial court had earlier in the day informed the defendant that he could not represent himself. We observed that "the court's instruction to not speak, combined with the court's subsequent categorical denial of the *Faretta* request, may well have convinced defendant the self-representation option was simply unavailable, and making the request again would be futile." (*Dent,* at p. 219.) In this case, however, following defendant's statement, defendant's case was transferred to Judge Nuss. If defendant sincerely wished to represent himself, he had the opportunity to make a *Faretta* request in front of a different judge. In fact, defendant did renew his *Marsden* request soon after his case was transferred to Judge Nuss. Two weeks later, on February 26, defendant made a second *Marsden* motion. At that hearing, Judge Nuss gave defendant ample opportunity to explain why he wished to replace counsel. At no point during that hearing did defendant

indicate he wished to represent himself if counsel was not replaced. More-over, as discussed below, defendant did in fact make an untimely *Faretta* request on the day of trial. This underscores the point that defendant understood that he could, if he wished, make a request to represent himself in this case.

Because defendant's February 10, 1992 statement was not an articulate and unmistakable demand for self-representation, there was no *Faretta* error.

### 2. *March 9, 1992* Faretta *Request*

On March 9, 1992, after the trial court denied defendant's motion to sever the escape charge from the murder charge, the court informed counsel, "I understand that we have approximately 100 jurors who are rapidly approach-ing the door." He asked if there were additional matters that needed to be addressed, at which point defendant stated to the court: "I have asked for a change of counsel and I understand that I can go pro per on this case. Because I feel that I could do a much better job if I investigate other things that I need to investigate. I feel that I have some investigating to take. And that's one of the reasons that I'd like to go pro per on this case."

The court asked if defendant would be prepared to proceed to trial that day. Defendant replied that he would not. After the court inquired into defendant's *Marsden* motions and his self-representation in another pending case, the court denied the request, stating:

"The Court: So you're very familiar with the procedure to go pro. per. You're also a [*sic*] very familiar with the fact that this is a case that's been pending now and you have been in custody on for almost 12 months. The motion is certainly untimely. [¶] The matter has been here ready to proceed to trial. And any granting of your right to go pro. per. would require the court to continue this case. [¶] And the court finds that this request at this late hour is not done in good faith by the defendant, but merely for the purposes of obtaining a continuance. The request is denied.

"The Defendant: I do have a constitutional right to go pro. per. under *Faretta*."

The court acknowledged that defendant had the right to represent himself, but reiterated that the request would not be granted because it was made in order to delay the trial. The court then informed defendant: "If you wish to proceed to trial today in pro. per., representing yourself, you have an absolute right and the court will permit you to do so. I will have [defense counsel] stand by as counsel, so that during the course of the trial if for some reason

you realize how mistaken you are to do this, [defense counsel] would be able to take over on the defense." Defendant retorted: "Well, in other words, what I got do is give up my rights. [¶] To get one right I have to give up a right. That's what you're making me do."

Defendant argues that this *Faretta* motion was timely because this was the "first available opportunity" he had for making such a motion in front of Judge Nuss, the trial judge. He argues that the pretrial judge, Judge Piatt, had improperly denied his *Faretta* motion of February 10, so any further *Faretta* requests in front of that judge would have been futile, and that this second *Faretta* motion was made as soon as defendant was transferred to Judge Nuss for trial.

We conclude that defendant's motion was untimely. Defendant asserted his right to self-representation moments before jury selection was set to begin. As we stated in *Windham*, "a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request. In such a case the motion for self-representation is addressed to the sound discretion of the trial court . . . ." (*Windham, supra,* 19 Cal.3d at p. 128, fn. 5.) Instead, "[i]n order to invoke the constitutionally mandated unconditional right of self-representation, a defendant must assert that right within a reasonable time prior to trial. The latter requirement serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice. [Citation.] If the motion is untimely—i.e., not asserted within a reasonable time prior to trial—the defendant has the burden of justifying the delay." (*People v. Horton* (1995) 11 Cal.4th 1068, 1110 [47 Cal.Rptr.2d 516, 906 P.2d 478].)

Moreover, we have found that defendant never made an unequivocal *Faretta* motion in front of Judge Piatt. And contrary to defendant's assertions, defendant did have a previous opportunity to request the right to represent himself in front of Judge Nuss. As detailed above, on February 26, defendant appeared before Judge Nuss in connection with a *Marsden* motion. Subsequently, defendant appeared again before Judge Nuss for several matters, including the beginning of jury selection on March 2. Therefore, defendant's March 9 *Faretta* motion was not made at the earliest available opportunity. To the contrary, the trial judge properly concluded that the motion was untimely.

Defendant argues that even if this request was untimely, the trial court failed to make an adequate inquiry and abused its discretion in denying defendant's request. Defendant concedes that the trial court did conduct an

inquiry, but alleges that it was limited and failed to satisfy the requirements set forth in *Windham, supra*, 19 Cal.3d at page 128.

" 'When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion.' [Citation.] In exercising this discretion, the trial court should consider factors such as ' "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." ' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 959 [95 Cal.Rptr.2d 377, 997 P.2d 1044], quoting *Windham, supra*, 19 Cal.3d at p. 128.)

The trial court found the *Faretta* motion was not made in good faith, but made "merely for the purposes of obtaining a continuance" and denied the motion. It is clear from the record that the trial court made an appropriate inquiry, and based on that inquiry denied defendant's *Faretta* motion. But in response to defendant's insistence that he had a constitutional right to proceed in propria persona, the court indicated that it would allow defendant to represent himself if he was able to proceed with the trial without delay. It did not, however, actually grant the *Faretta* motion.

"Although a necessary continuance must be granted if a motion for self-representation is granted, it is also established that a midtrial *Faretta* motion may be denied on the ground that delay or a continuance would be required." (*People v. Clark, supra*, 3 Cal.4th at p. 110.) Thus, the court acted within its discretion in concluding that defendant could represent himself only if he was ready to proceed to trial without delay. (See *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1689 [43 Cal.Rptr.2d 129]; see also *United States v. Flewitt* (9th Cir. 1989) 874 F.2d 669, 674–675 ["if the court determines the defendant's request is merely a tactic designed to delay the trial, the court has the discretion to deny the continuance and require the defendant to proceed to trial as scheduled either with his counsel or in propria persona"].)

### III. GUILT PHASE ISSUES

#### A. Sufficiency of the Evidence to Support the Felony-murder Conviction and the Robbery-murder Special Circumstance

Defendant contends the evidence was insufficient to sustain his conviction for felony murder and the special circumstance finding that the murder was committed during the commission of a robbery and therefore his due process and Eighth Amendment rights under the United States Constitution were

violated. He maintains that the evidence, at most, "creates an unsubstantiated suspicion that [he] behaved in a manner which could constitute the elements of robbery." He argues there was insufficient evidence that the victim was actually robbed; that if he was robbed, defendant was the perpetrator; and if defendant was the perpetrator, that he formed the intent to steal before or during the use of force.

The applicable standard of review is well settled: " 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 553 [127 Cal.Rptr.2d 802, 58 P.3d 931], quoting *People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 99 S.Ct. 2781].) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal.Rptr. 467, 760 P.2d 996], quoting *People v. Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382].) The standard of review is the same when the prosecution relies mainly on circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

We conclude that substantial evidence supports the robbery-murder conviction and the special circumstance finding. The prosecution introduced evidence that defendant was the last person seen with the victim. The victim had cashed a tax refund check in the amount of $1,200 two days before the murder and in the hours before the murder, the victim boasted, in the presence of defendant, that he was going to Mexico the next morning and was taking $3,000 with him. Defendant was left alone with the victim when Vasquez, Perez, and Macias left. They returned approximately 10 minutes later, at which time the victim was dead. When the police arrived, they found the victim's left pants pocket turned inside out with bloodstains on the interior of the pocket. He was wearing jewelry and his other pants pocket, which was undisturbed, contained approximately $80. The $3,000 was never recovered, and defendant, who was unemployed, had $100 on his person when he was arrested the next day. Moreover, defendant was linked to the murder by his palm print, made in wet blood that was consistent with that of the victim, discovered on the Jennings .22-caliber handgun found in the Monte Carlo.

Based upon this evidence, the jury could reasonably have found that the victim possessed a large amount of cash on the night he was killed and that

defendant stayed behind after Vasquez, Macias, and Perez left in order to rob the victim of the money. The victim's bloodstained, turned-out pocket supports the inference that, after shooting the victim, defendant retrieved the money from the victim's pants pocket. (See, e.g., *People v. Marks* (2003) 31 Cal.4th 197, 230 [2 Cal.Rptr.3d 252, 72 P.3d 1222] [sufficient circumstantial evidence supported robbery murder conviction based on evidence that the victim usually carried several $1 bills, no paper currency was found on the victim or in his taxicab, and defendant had seven $1 bills on his person when he was arrested].)

■ Defendant additionally argues that even if sufficient evidence existed to support the conviction for robbery murder, the evidence was nonetheless insufficient to support the robbery-murder special circumstance. Noting that the robbery must not have been merely incidental to the killing (see *People v. Green* (1980) 27 Cal.3d 1, 62 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*), overruled on other grounds in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99]), defendant argues there was insufficient evidence establishing that he killed the victim in order to advance the independent felonious purpose of robbery. To prove the robbery-murder special circumstance, the prosecution was required to prove that defendant formed the intent to steal before or while killing the victim. (See, e.g., *People v. Yeoman* (2003) 31 Cal.4th 93, 127 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) We apply the same standard used to determine the sufficiency of the evidence with respect to the robbery-murder conviction. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1010 [108 Cal.Rptr.2d 291, 25 P.3d 519] (*Cunningham*).)

Defendant relies heavily on two cases in support of his contention, but neither case is apposite. In *People v. Morris* (1988) 46 Cal.3d 1 [249 Cal.Rptr. 119, 756 P.2d 843], overruled on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543–544, footnote 5 [37 Cal.Rptr.2d 446, 887 P.2d 527], the victim was killed in a public bathhouse while wearing only socks and shoes and the only property missing from his locker was a department store credit card. The defendant later attempted to use the credit card. The defendant told an acquaintance that he had "been making money off 'dates' with homosexuals" and that he killed one (*Morris*, at p. 11); he gave no reason for the killing except that " 'he had to kill one.' " (*Id.* at p. 20.)

We held this evidence was insufficient to support the robbery-murder special circumstance. We noted that "[t]he record contains *no* evidence that any personal property was in the victim's possession at the time of the murder, or that any personal property of the victim was ever recovered subsequent to the murder with the possible exception of the credit card." (*People v. Morris, supra,* 46 Cal.3d at p. 20, italics added.) That the murder

did not occur during the commission of a robbery was supported by the fact the victim was not wearing any clothing when he was killed, and evidence existed that the defendant's motive for visiting the bathhouse was to prostitute himself.

Similarly, in *Marshall, supra,* 15 Cal.4th 1, this court overturned a robbery conviction and robbery-murder special circumstance. In that case, the defendant was convicted of the rape, robbery, and murder of a prostitute. The defendant was apprehended coming out of the building where the murder took place and was immediately searched by the police. The police did not find any money or other property belonging to the victim, but did find a letter from a grocery store responding to the victim's request for a check-cashing card. In holding that this was insufficient evidence to uphold the robbery-murder special circumstance, this court explained that there was no evidence the defendant killed the victim for the purpose of obtaining the letter, or any evidence "tending to show that the grocery's letter . . . was so valuable to defendant that he would be willing to commit murder to obtain it." (*Id.* at p. 35.)

In the present case, there is ample evidence that the victim was robbed, that defendant remained behind after the others left in order to rob the victim, and that defendant killed the victim to accomplish that purpose. The evidence is sufficient to support defendant's conviction of felony murder, and the robbery-murder special-circumstance finding.

### B. *Evidence of Third Party Culpability*

Defendant contends the trial court deprived him of his state and federal constitutional rights to due process and a fair trial when it excluded his proffered testimony relating to third party culpability. In light of defendant's offer of proof in the trial court, we find no error.

At a hearing pursuant to section 402 of the Evidence Code, defendant made an offer of proof that when Detective Guenther arrived at the crime scene he noticed shoe prints leading toward an alley north of the victim's house. He subsequently learned that officers were detaining a group of individuals who had been discovered in the alley. Detective Guenther approached one of the individuals, Liberato Gutierrez,[7] and noticed that he was "extremely nervous [and] his hands were shaking." He arrested Liberato Gutierrez after observing a spot of blood on his shirt, and two spots on one of his work boots.

---

[7] No relation to Andreas Gutierrez. For the purpose of clarity, Liberato Gutierrez will be referred to by his full name.

The prosecution objected to the testimony pursuant to Evidence Code section 352, arguing in part: "Your honor, in—what counsel I think is trying to elicit in this manner is, in fact, that Liberato Gutierrez could be the murderer in this case."[8] Defense counsel emphatically disagreed: "The purpose of bringing up Liberato Gutierrez, the blood and the shoes, *is not what the People are articulating in any shape, fashion or form.* The purpose, your honor, is that you have a very serious matter, you have a murder investigation that's going on. You have footprints that have been established by shoes, not by [feet] but by shoes. . . . You have an individual who has blood on his shirt, there is—the testimony will be that the blood has not been analyzed." (Italics added.)

Defense counsel added: "[Detective] Terrio, according to the offer of proof by the People, examined the shoes, concluded that the shoes were not the shoe that left the impressions on the concrete. That doesn't mean that the individual was not in the home at some point in time, doesn't mean that the individual didn't take money or property and left, doesn't mean that the blood on the shirt or on the shoes doesn't match or isn't consistent with [the victim]. Doesn't mean that the focus of the investigation is not specific, is not precise.

"You have footprints that are important to [Detective] Terrio at the time that he looked at the shoes. But the footprints are not important with respect to other peace officers, what impressions they had [*sic*] did they go into the home?

"The impressions are not important with respect to Arturo Vasquez. Was he wearing tennis shoes? What type of impressions did he leave, if he left any? What about Rigoberto Perez? Was he wearing tennis shoes? Let's look at his tennis shoes and compare them to the impressions that are on the concrete.

"What about El Pato? Was he wearing tennis shoes when he was there? These are all important issues that raise issues of reasonable doubt as to whether or not [defendant] performed this act in this crime."

Defense counsel concluded: "It is *not pointing a finger at Mr. Liberato Gutierrez and saying you're the killer, you're the one that took the money.*

---

[8] The prosecution also stated that Detective Guenther also would testify, inter alia, that two other individuals were arrested along with Liberato Gutierrez, Liberato Gutierrez was "quite inebriated [registering a .30 blood-alcohol level] when a breathalyzer was taken," and that everyone in the alley was taken into custody until everything was sorted out. The prosecutor further stated that she did not believe Liberato Gutierrez was ever considered a suspect and that his work boots, which were examined by Detective Terrio on more than one occasion, did not match any of the shoe prints left at the crime scene.

That's not the issue. The issue has to do with whether or not these 12 people can believe and rely upon the investigation that was performed by the Pomona Police Department as well as the Sheriff's Department. [¶] And it's important for them to have that information and for them to evaluate that information." (Italics added.)

The trial court sustained the prosecution's objection to the testimony, ruling: "The court finds that the probative value of that testimony is outweighed by the necessity of the undue consumption of further time. It would create a substantial danger of confusing the issues and of misleading the jury. [Detective Guenther] will not be permitted to testify in that area. I am not restricting the testimony as to other areas."

Defendant contends that had the jury heard evidence of Liberato Gutierrez's arrest in the alley, the blood on his shirt and shoe, his nervousness, and his "apparent lack of explanation" for his presence in the alley so late at night,[9] the jury could have found reasonable doubt existed that defendant was the murderer or robber. The jury, defendant theorizes, could have found that an inebriated Liberato Gutierrez entered the victim's home intending to burglarize it, and upon finding the victim may have shot and robbed him. Or, alternatively, the jury could have found that Liberato Gutierrez, at the very least, took the money from the victim's pocket.

A trial court's ruling under section 352 of the Evidence Code is reviewed for abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 372–373 [110 Cal.Rptr.2d 272, 28 P.3d 34].) "[T]o preserve an alleged error for appeal an offer of proof must inform the trial court of the 'purpose, and relevance of the excluded evidence . . . .' (Evid. Code, § 354, subd. (a).) This is in accord with 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal*.' [Citation.]" (*People v. Hill* (1992) 3 Cal.4th 959, 989 [13 Cal.Rptr.2d 475, 839 P.2d 984], disapproved on another ground in *People v. Price* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

Contrary to defendant's argument on appeal that the trial court erroneously excluded third party culpability evidence that Liberato Gutierrez may have been the person responsible for killing or robbing the victim, his offer of proof at trial was expressly not directed at "pointing the finger" at Liberato Gutierrez.[10] As is evident from defense counsel's offer of proof, the proffered evidence was instead intended to challenge and undermine the police investigation of the murder, specifically the failure to investigate and pinpoint the

---

[9] This latter point was not presented to the trial court in the offer of proof.

[10] In *People v. Hall, supra,* 41 Cal.3d 826, we held that third party culpability evidence should be treated like any other evidence. It is admissible if it is relevant and its probative

source of the shoe prints discovered at the crime scene. Based on this offer of proof, the trial court made an explicit ruling pursuant to Evidence Code section 352, which, under the deferential standard of review, this court will not second-guess on the basis that defense counsel really did not mean what he said. Simply put, defense counsel stated in the trial court that he was not implicating Liberato Gutierrez, but on appeal defendant is arguing that Liberato Gutierrez may have been the killer or robber. Defendant is now asking that we address the merits of his new theory, based on a hypothetical offer of proof—if he had argued that Liberato Gutierrez was culpable, the trial court erred in excluding that evidence. But as discussed above, that is not what defendant argued in the trial court; thus we cannot hold the trial court abused its discretion in rejecting a claim that was never made.

Because defendant's proffered testimony was not directed at eliciting testimony that Liberato Gutierrez was the person responsible for killing or robbing the victim, but rather was aimed at a general attack on the police investigation, the trial court did not abuse its discretion under Evidence Code section 352 in limiting defendant's examination of Detective Guenther. The probative value of such an attack on the investigation was minimal and was properly excluded under Evidence Code section 352. In any event, defendant does not challenge the trial court's ruling in this respect. "Defendant's present contention as to [third party culpability and Liberato Gutierrez] comes too late." (*People v. Hill, supra,* 3 Cal.4th at p. 989.)

We note that the trial court expressly did not prohibit defense counsel from eliciting testimony from Detective Guenther regarding the group of individuals in the alley, of which Liberato Gutierrez was a part, ruling that Detective Guenther "can testify as to the arrest of other individuals in the alley by Detective McLean. He can testify as to what he observed, obviously. He may not testify as to the specifics of Mr. Gutierrez in particular, the fact that he was nervous, the drops of blood, what appeared to be blood on his shoes, and, of course, on his shirt." Subsequently, during counsel's direct examination of Detective Guenther, defense counsel asked the court to clarify its ruling; specifically, whether he could ask Detective Guenther whether he was informed about the group of individuals in the alley. The court responded in the affirmative and continued: "I think he can even say they were arrested. I don't have a problem with that. Just when we start getting into the specifics of the people, the blood, or apparent blood." In a general sense, defendant was able to elicit testimony that others may have had the opportunity to rob or kill the victim. As Detective Guenther testified, he walked through the side yard, on the west side of the house, and noted shoe prints that appeared to lead toward the alley. He stated that the individuals were in the alley, but

value is not "substantially outweighed by the risk of undue delay, prejudice, or confusion" under section 352 of the Evidence Code. (*Hall,* at p. 833 .)

explained they were discovered four residences east of the victim's house, not behind the house as defense counsel suggested. The following is the remainder of the direct testimony in this area:

"Q: Those individuals were detained?

"A: Yes.

"Q: Those individuals were interviewed?

"A: Not by me, but my understanding is, later on they were. They spoke only Spanish so I couldn't talk to them.

"Q: Okay."

The jury thus heard evidence that other individuals were in the vicinity after the murder. The jury could have concluded, as defendant argues on appeal, that any of those individuals murdered or robbed the victim. Further, the trial court did not prevent defense counsel from posing additional questions concerning the detention and investigation of the group, such as whether shoe comparisons were made of the group or whether the individuals gave a reason for being in the alley so late at night. Defense counsel chose not to do so.

## C. *Jury Instruction Claims*

Defendant contends the trial court erred in failing to instruct the jury sua sponte on theft, after-acquired intent, first degree premeditated murder and second degree murder, and erred in giving the jury a truncated version of CALJIC No. 8.81.17. Such error, according to defendant, violated his United States Constitution Fifth, Sixth, Eighth, and Fourteenth Amendment rights. We find no error.

### 1. *Failure to Instruct on Theft as a Lesser Included Offense of Robbery*

■ Defendant contends the trial court erred in failing to instruct the jury sua sponte on theft as a lesser included offense of robbery. Although theft is a lesser included offense of robbery (*People v. Turner* (1990) 50 Cal.3d 668, 690 [268 Cal.Rptr. 706, 789 P.2d 887]; *People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613]), defendant was not charged with robbery. As this court has recently made clear, when robbery is not a charged offense but merely forms the basis for a felony-murder charge and a special circumstance allegation, a trial court does not

have a sua sponte duty to instruct the jury on theft. (*People v. Cash* (2002) 28 Cal.4th 703, 737 [122 Cal.Rptr.2d 545, 50 P.3d 332] (*Cash*) ["Defendant . . . was not charged with robbery, and the court therefore had no duty to instruct on theft as a lesser included offense of robbery."]; *Silva, supra,* 25 Cal.4th at p. 371 ["Although a trial court on its own initiative must instruct the jury on lesser included offenses of *charged* offenses, this duty does not extend to *uncharged* offenses relevant only as predicate offenses under the felony-murder doctrine."].) As in *Silva* and *Cash*, defendant was not charged with robbery; rather, robbery was the underlying predicate felony in the felony-murder charge and the special circumstance allegation.

Defendant attempts to distinguish *Silva* on the ground that the jury in *Silva* was instructed on felony murder, robbery murder, and first degree premeditated and deliberate murder, while in his case, the jury was instructed only on felony murder. This distinction is of little or no significance. The issue presented here is whether the trial court had a sua sponte duty to instruct the jury on a lesser included offense of an uncharged crime. That issue was resolved in *Silva* contrary to defendant's position.

We also reject defendant's assertion that *Silva* rests on faulty reasoning and decline his invitation to revisit the issue.

## 2. *Failure to Instruct on After-acquired Intent*

■ Defendant did not request a jury instruction on after-acquired intent, which would have informed the jury that if defendant first formed the intent to steal after killing or applying force against the victim, he could not be found guilty of robbery. He contends on appeal, however, that the trial court had a sua sponte duty to so instruct the jury. As we stated in *Silva*, an after-acquired intent instruction is a pinpoint instruction that the trial court need not give sua sponte. (*Silva, supra,* 25 Cal.4th at p. 371, citing *People v. Webster* (1991) 54 Cal.3d 411, 443 [285 Cal.Rptr. 31, 814 P.2d 1273].)

In any case, along with the standard robbery instruction, CALJIC No. 9.40,[11] the trial court gave the felony-murder instruction, CALJIC No. 8.21,

---

[11] The trial court instructed the jury pursuant to CALJIC No. 9.40 as follows:

"Defendant is alleged to have committed the crime of robbery, a violation of Section 211 of the Penal Code as a special circumstance. Every person who takes personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property, is guilty of the crime of robbery in violation of Penal Code Section 211.

"In order to prove such a crime, each of the following elements must be proved:

"1. A person had possession of property of some value however slight,

"2. Such property was taken from such person or from his immediate presence,

which instructed the jury that a killing "which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime." We recently reaffirmed that CALJIC Nos. 9.40 and 8.21 together " 'adequately cover the issue of the time of the formation of the intent to steal.' " (*People v. Hughes* (2002) 27 Cal.4th 287, 359 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836]; *Silva, supra,* 25 Cal.4th at p. 371; *People v. Hayes* (1990) 52 Cal.3d 577, 625–626 [276 Cal.Rptr. 874, 802 P.2d 376].)

The defendant in *Hughes* argued, as does defendant here, that the version of CALJIC No. 8.21 given in his case was crucially different from the one this court upheld in *Hayes* and *Hendricks*. In those cases, in addition to the language quoted above, the version of CALJIC No. 8.21 read to the jury also stated that a killing was first degree murder if it occurred "*as a result of* the commission of . . . robbery" (*People v. Hughes, supra,* 27 Cal.4th at p. 359), while in *Hughes,* as well as in this case, the "as a result of " language was not given. In *Hughes,* we found the omission insignificant. This was especially so because, as in this case, the *Hughes* jury was also given CALJIC No. 3.31, which instructed the jury that there must exist a concurrence of act or conduct and specific intent.[12] "Reading CALJIC Nos. 8.21 and 9.40 together with No. 3.31, we believe that a reasonable juror would understand that defendant had to possess the specific intent to steal prior to or during his application of the force required for the commission of the offense of robbery." (*Hughes, supra,* at p. 360.) We therefore reject defendant's claim of error.[13]

### 3. *Truncated CALJIC No. 8.81.17*

Defendant next contends the trial court erroneously gave the jury a truncated version of CALJIC No. 8.81.17, which defines the robbery-murder special circumstance, depriving him of his federal Constitution Sixth and Fourteenth Amendment rights to a trial by jury on the special circumstance allegation. The version of CALJIC No. 8.81.17 read to the jury instructed:

---

"3. Such property was taken against the will of such person,

"4. The taking was accomplished either by force, violence, fear or intimidation, and

"5. Such property was taken with the specific intent permanently to deprive such person of the property."

[12] CALJIC No. 3.31 instructed the jury: "In the crime and allegations charged in count one of the information, as a special circumstance, namely, robbery, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crime or allegation to which it relates is not committed."

[13] Even if defendant requested an instruction on after-acquired intent, the trial court was not compelled to give it because there was no substantial evidence that the defendant first formed the intent to take the victim's money only after he killed the victim or applied force. (Cf. *People v. Turner, supra,* 50 Cal.3d at pp. 690–691.)

"To find that the special circumstance, referred to in these instructions as murder in the commission of robbery is true, it must be proved: 1a. The murder was committed while the defendant was engaged in the commission of a robbery." Omitted from the instruction was the following language: "The murder was committed in order to carry out or advance the commission of the [robbery] or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [robbery] was merely incidental to the commission of the murder."

Defendant argues the omission was critical and prejudicial because it allowed the jury to find true the robbery-murder special circumstance based merely on a finding that the murder took place during a robbery, as opposed to finding that the murder occurred to advance the independent felonious purpose of robbery. Such error, defendant urges, is reversible per se.

■ Defendant did not request the clarifying language he now contends was crucial and may not now "complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete." (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627]; *People v. Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285].) Defendant's failure to either object to the proposed instruction or request that the omitted language be given to the jury forfeits his claim on appeal. (*People v. Hart, supra,* 20 Cal.4th at p. 622.) The claim fails on the merits as well.

■ The language defendant asserts should have been included in the court's instruction is based upon our discussion in *Green, supra,* 27 Cal.3d at page 61, in which we observed that the purpose of the special circumstance was to single out those "defendants who killed in cold blood in order to advance an independent felonious purpose. . . ." (See also *People v. Thompson* (1980) 27 Cal.3d 303, 322 [165 Cal.Rptr. 289, 611 P.2d 883].) Although the defendant in *Green* technically committed a robbery, it was clear from the evidence that it was not "a murder in the commission of a robbery but the exact opposite, a robbery in the commission of a murder." (*Green, supra,* at p. 60.) But in *People v. Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803], we expressly rejected the "suggestion that *Green's* clarification of the scope of felony-murder special circumstances has somehow become an 'element' of such special circumstances, on which the jury must be instructed in all cases regardless of whether the *evidence* supports such an instruction." (*Kimble, supra,* 44 Cal.3d at p. 501; *People v. Navarette* (2003) 30 Cal.4th 458, 505 [133 Cal.Rptr.2d 89, 66 P.3d 1182] [no error in giving truncated instruction where "no significant evidence of any motive for the murders other than"

robbery existed].) *Green* simply made clear that a robbery, in a special circumstance allegation, cannot be "merely incidental to the murder." (*Green,* at p. 61.)[14]

### 4. *Failure to Instruct on First Degree Premeditated Murder and Second Degree Murder*

The trial court instructed the jury on first degree felony murder[15] and on the definition of murder.[16] Defendant contends the trial court's failure also to instruct, sua sponte, on first degree premeditated murder and second degree murder as lesser included offenses of felony murder deprived him of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution.[17] Defendant argues that failure to give these instructions

---

[14] The dissent concludes that the jury received an incomplete instruction in this regard, and that the prosecutor exacerbated the problem by arguing to the jury that the first degree felony-murder charge and the special circumstance allegation were identical. (Dis. opn., *post,* at pp. 146–147.) But as we have explained, the instruction was legally correct and the omitted language is not an element of the special circumstance allegation on which the jury must be instructed in all cases. With respect to the prosecutor's argument to the jury, we presume the jury followed the court's instructions and not the argument of counsel. (See *People v. Mayfield* (1993) 5 Cal.4th 142, 179 [19 Cal.Rptr.2d 836, 852 P.2d 331], quoting *People v. Clair* (1992) 2 Cal.4th 629, 633, fn. 8 [7 Cal.Rptr.2d 564, 828 P.2d 705] ["The court's instructions, not the prosecution's argument, are determinative, for 'We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade' "].) The jury was instructed that it must accept the law as stated by the court, and "[i]f anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions."

[15] "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime. [¶] The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."

[16] "Every person who unlawfully kills a human being during the commission or attempted commission of a robbery is guilty of the crime of murder in violation of Section 187 of the Penal Code. In order to prove such crimes, each of the following elements must be proved:
"1. A human being was killed.
"2. The killing was unlawful and
"3. The killing occurred during the commission or attempted commission of a robbery.
"4. A killing is unlawful if it was neither justified nor excusable."

[17] In arguing that the trial court should have instructed the jury on a noncapital murder offense, defendant characterizes both first degree premeditated murder and second degree murder as lesser included offenses of felony murder. First degree premeditated murder, however, is not a lesser necessarily included offense of felony murder. Although their elements differ, first degree premeditated murder and felony murder are different theories of the "single statutory offense of murder. [Citations.]" (*Silva, supra,* 25 Cal.4th at p. 367.) The Attorney General posits that neither first degree premeditated murder nor second degree murder is a lesser included offense of felony murder because malice is an element of the former offenses, but not of the latter. (See, e.g., *People v. Rios* (2000) 23 Cal.4th 450, 460, fn. 6 [97 Cal.Rptr.2d

violated his constitutional rights because the jury was left with an " 'unwarranted all-or-nothing choice' " (*People v. Ramkeesoon, supra,* 39 Cal.3d at p. 352), making it likely that it resolved any doubts in favor of conviction (*Beck v. Alabama* (1980) 447 U.S. 625, 634 [65 L.Ed.2d 392, 100 S.Ct. 2382] (*Beck*)).

" ' "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence." [Citations.]' " (*Cunningham, supra,* 25 Cal.4th at p. 1007, quoting *People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Accordingly, " ' "[i]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

■ Although defense counsel advised the court that after consulting with defendant he did not want the jury instructed on lesser included offenses, the "obligation to instruct on [such] offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." (*People v. Breverman, supra,* 19 Cal.4th at p. 154.) The Attorney General contends that under the invited error doctrine, defendant may not now complain on appeal that such instructions were not given because defense counsel informed the trial court that, after consulting with defendant, they did "not want to request any lessers." Invited error, however, will only be found if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction. (*People v. Cooper* (1991) 53 Cal.3d 771, 830 [281 Cal.Rptr. 90, 809 P.2d 865]; *People v. Wickersham* (1982) 32 Cal.3d 307, 332 [185 Cal.Rptr. 436, 650 P.2d 311].) The record in this case is ambiguous as to whether defense counsel was referring solely to voluntary and involuntary manslaughter instructions, which had been raised as possible jury instructions in previous discussions between the court, defense counsel, and the prosecutor, or whether defense counsel considered and rejected instructions on all potential lesser included offenses.

512, 2 P.3d 1066] [pointing to felony murder and noting that not all murders require the prosecution to prove malice].) Because of our disposition of this issue, we do not address here whether second degree murder is a lesser included offense of felony murder.

Therefore, we do not find invited error with respect to the lack of an instruction on second degree murder.

We conclude, nonetheless, that the trial court did not err in failing to instruct the jury sua sponte on second degree murder because " '[s]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense.' " (*People v. Sakarias* (2000) 22 Cal.4th 596, 620 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Wilson* (1992) 3 Cal.4th 926, 941 [13 Cal.Rptr.2d 259, 838 P.2d 1212] (*Wilson*).) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*People v. Breverman, supra,* 19 Cal.4th at p. 162.) Rather, substantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense. (*Ibid.*) " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " (*Cunningham, supra,* 25 Cal.4th at p. 1008.)[18]

■ There was no substantial evidence introduced at defendant's trial that the killing was other than robbery murder.[19] And on appeal defendant does not advance a theory that would support a second degree murder instruction, but merely points to evidence that there may have been a struggle in the house and that the victim was shot at close range.[20] This is insufficient to support the murder instruction defendant claims should have been given to the jury sua sponte. (See, e.g., *People v. Avena* (1996) 13 Cal.4th 394, 424 [53 Cal.Rptr.2d 301, 916 P.2d 1000] [" 'Defendant advances no theory consistent with the evidence that would have allowed the jury to convict him of second degree murder' "]; *People v. Morris* (1991) 53 Cal.3d 152, 211 [279 Cal.Rptr. 720, 807 P.2d 949], overruled on another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

---

[18] Contrary to the dissent's contention (dis. opn., *post,* at p. 142), we do not base our conclusion on whether substantial evidence exists to support the robbery-murder charge, but rather ground our decision on the lack of sufficient evidence warranting a sua sponte instruction on second degree murder.

[19] Because the prosecution proceeded on only a felony-murder theory, it was not required to prove malice—express or implied. (See *People v. Dillon* (1983) 34 Cal.3d 441, 475 [194 Cal.Rptr. 390, 668 P.2d 697] ["In every case of murder other than felony murder the prosecution undoubtedly has the burden of proving malice as an element of the crime"].) The prosecution only needed to prove that the victim was killed during the course of a robbery—accidentally or otherwise.

[20] The fact that the victim suffered some shots from close range is not surprising given that the living room, which was used as the bedroom, was relatively small, measuring 13.5 by 11 feet, and the apparent murder weapon was situated next to the victim while he was lying on a mattress on the floor.

At most, defendant raises the issue of sufficiency of the evidence relating to the robbery, and from that would have us hold that he acted with malice in killing defendant and he could, therefore, have been found guilty of second degree murder, and even first degree premeditated murder. But "[a]ll the evidence points to robbery as the motive for the killing[]" (*People v. Duncan* (1991) 53 Cal.3d 955, 970 [281 Cal.Rptr. 273, 810 P.2d 131]), and contrary to defendant's assertion, the evidence relating to the robbery was not weak or virtually nonexistent (see *ante*, at pp. 104–106).[21] Indeed, in his argument on appeal, defendant accepts the prosecution evidence and theory that he did not have a gun while at the victim's house and that he did not go to the victim's house with the intention of killing him. Based on this, a jury finding of second degree murder, and especially first degree premeditated murder, would have been based on pure speculation. The defendant concedes as much when he argues to this court that he "may have killed [the victim] in self defense, in anger, or for any reason ranging from first degree murder to justifiable homicide." He speculates further that a gunfight may have ensued between himself and the victim or that the victim may have shot at defendant, causing the defendant to retaliate. He states: "There is no way of telling when or in what order any of this transpired."

We rejected a similar argument in *Wilson, supra*, 3 Cal.4th 926. The victim in *Wilson* was discovered in his automobile with his left pants pocket turned inside out, and a $20 bill in his rear pocket. (*Id.* at p. 931.) Similar to defendant's contention in this case, the defendant in *Wilson* argued that a second degree murder instruction was warranted because the circumstantial

---

[21] The dissent likewise questions the strength of the robbery predicate felony, stating that there was no evidence defendant heard the victim boast about the large sum of money and his planned trip to Mexico, pointing out that the living room was filled with men who had been drinking, defendant was not situated next to the victim, and the television was on. Moreover, the dissent notes that because the victim was in his own home, the jury was not compelled to find that he was carrying a wallet at the time of the murder, and given that defendant was unemployed, it would makes sense that, if defendant in fact killed the victim in order to rob him, he would have taken everything of value, but the body was found with $80 in one pocket and the victim was wearing jewelry. Defendant, when arrested, had only $100 on his person. (Dis. opn., *post*, at p. 144.)

However, the fact that defendant was not situated next to the victim is not significant because, as we observed, *ante*, in footnote 20, the living room where the conversation took place was relatively small. While it is true that the victim and the other men had been drinking, by the time Macias arrived at the house it appears the men were subdued; Perez was falling asleep, Vasquez was watching television and not paying attention to the conversation, and the victim wanted to go to sleep. The fact that some money and jewelry were found on the victim, supports the inference that defendant found what he desired—the $1,200 or $3,000—and searched no further. Finally, the fact that defendant had only $100 at the time of his arrest does not undermine the robbery predicate felony. One hundred dollars in cash is a significant sum of money for most people to carry, even when gainfully employed. Also, defendant was arrested 24 hours after the murder, giving him sufficient time to conceal the remainder of the money. As such, we do not share the dissent's view that evidence of a robbery was "far from compelling."

evidence did not conclusively prove that the murder was committed during the course of a robbery. As in this case, the defendant in *Wilson* also maintained that "the evidence was not inconsistent with the theory that [he] shot and killed the victim . . . and then fled, and that another person then came upon the victim's body and removed the wallet, or that the victim was not carrying a wallet or cash at the time he was shot." (*Id.* at p. 940.) We held the trial court did not err in refusing to instruct the jury on second degree murder because the defendant's argument rested on mere speculation.[22]

Because there was no substantial evidence supporting an instruction on second degree murder, the high court's decision in *Beck* is not implicated. As defendant acknowledges, even under *Beck*, instructions on lesser included offenses are not constitutionally required in the absence of evidence warranting those instructions. In *Beck*, the state conceded that, but for the prohibition on giving instructions on lesser included offenses in capital cases, the defendant's testimony would have entitled him to an instruction on a lesser included offense. (*Beck, supra,* 447 U.S. at p. 630.)[23] Moreover, as the Supreme Court clarified, the constitutional infirmity of the law invalidated in *Beck* was partly the result of the "artificial barrier" erected in capital cases prohibiting instructions on any lesser included offenses, even though such instructions were available in noncapital cases. (See *Hopkins v. Reeves, supra,* 524 U.S. 88, 97–98 [141 L.E.2d 76, 118 S.Ct. 1895].) But as we have previously explained, California does not preclude a trial court from giving

---

[22] The dissent questions our reliance on *Wilson*, contending that the dissimilarities outweigh the similarities. (Dis. opn., *post*, at p. 146.) We disagree with this characterization. As in this case, the defendant in *Wilson* knew the victim and had even lived with him for a period of time, there was no indication in the opinion's discussion that the victim's wallet, nor any other property, was discovered in the defendant's possession, and finally the victim was shot at close range. (*Wilson, supra,* 3 Cal.4th at pp. 931, 938.) While the dissent is correct that the defendant in *Wilson* made incriminating statements regarding the robbery, the jury could have disregarded those statements, especially given that one statement was made to a fellow inmate. As explained above, like defendant here, the defendant in *Wilson* contended that the jury could have found that he killed the victim, but someone else came across the dead body and took the wallet. In rejecting the defendant's contention on appeal, we explained: "The victim, last seen carrying a trucker's wallet attached with a chain to his belt, was discovered after his death with his belt undone, and with his wallet and most of his cash missing. Also, the victim had been shot twice in the head [while he was sleeping], indicating a deliberate, purposeful killing. There was only bare speculation, not substantial evidence, to support the theory presently advanced by defendant—that the murder did not coincide with the taking of the victim's money." (*Id.* at pp. 940–941.)

[23] The law at issue in *Beck* prohibited giving lesser included offense instructions in capital cases while they remained available in noncapital cases. Additionally, the jury was instructed that if they found the defendant guilty, they were mandated to impose the death penalty. (*Beck, supra,* 447 U.S. at p. 639, fn. 15.) In such a case, the jury was left with only "two options: to convict the defendant of the capital crime, in which case they were required to impose the death penalty, or to acquit." (*Hopkins v. Reeves* (1998) 524 U.S. 88, 95 [141 L.Ed.2d 76, 118 S.Ct. 1895], fn. omitted.)

instructions on lesser included offenses in capital cases. (See *People v. Waidla* (2000) 22 Cal.4th 690, 736, fn. 15 [94 Cal.Rptr.2d 396, 996 P.2d 46].) We also explained in *People v. Waidla* that "the *Beck* rule [was] not implicated in its purpose" in that case because the "jury was not forced into an all-or-nothing choice between a conviction of murder that would *legally compel it to fix the penalty at death*, on the one side, and innocence, on the other: Even if it found [the defendant] guilty of [felony murder under the special circumstance allegations], it was not legally compelled to fix the penalty at death, but could fix it instead at a term of imprisonment for life without possibility of parole." (*Ibid.*, italics added.) The same is true in this case.

### D. *Denial of Severance Motion*

Defendant was charged with escape stemming from his flight from custody. The trial court, over defendant's objection, granted the prosecution's motion to consolidate the murder and escape charges. Prior to trial, defendant filed a motion to sever the charges, which the trial court denied. Defendant contends on appeal that the trial court erred in consolidating the charges and in later refusing to sever them, violating his due process and fair trial rights under both the state and federal Constitutions.

Section 954 provides for joinder of "two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses." Defendant contends the joinder of the charges here did not meet the requirements of section 954 because the charged offenses were neither "of the same class" nor "connected together in their commission."

We agree with the Attorney General that the charges were connected in their commission. "Offenses 'committed at different times and places against different victims are nevertheless "connected together in their commission" when they are . . . linked by a " 'common element of substantial importance.' " [Citations.]' " (*People v. Mendoza, supra*, 24 Cal.4th at p. 160, quoting *People v. Lucky, supra*, 45 Cal.3d at p. 276.) Although the murder itself occurred almost two years prior to defendant's escape, the offenses were nonetheless connected because the escape occurred as defendant was being returned to "lock-up" following his arraignment on the murder charge. The apparent motive for the escape was to avoid prosecution for the murder.

Because the charges were properly joined under section 954, "defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying defendant's severance motion. [Citations.]" (*People v. Mendoza, supra*, 24 Cal.4th at p. 160.) Since the escape charge was joined with a capital crime, we " 'consider the [joined] cases both separately and

together in order to fairly assess whether joinder would tend to produce a conviction when one might not be obtainable on the evidence at separate trials.' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1244 [74 Cal.Rptr.2d 212, 954 P.2d 475], quoting *Williams v. Superior Court* (1984) 36 Cal.3d 441, 454 [204 Cal.Rptr. 700, 683 P.2d 699].) We consider the record before the trial court at the time of the motion and assess the ruling in light of the following factors: whether the evidence is cross-admissible in separate trials; whether some of the charges are likely to inflame the jury; whether a weak case has been joined with a strong case so that a "spillover" effect might affect the outcome; and whether one of the joined charges is a capital crime. (*People v. Mendoza, supra,* at p. 161; *People v. Musselwhite, supra,* at p. 1244.)

After reviewing the record, we conclude the trial court did not abuse its discretion in denying the severance motion. Most significantly, defendant did not suffer undue prejudice as a result of the joinder because the evidence of both offenses was cross-admissible, a fact which the trial court highlighted. At the severance hearing, the trial court asked defense counsel: "[W]hile you may win a victory and you get your counts severed, doesn't the evidence come in anyway?" (See *People v. Arias* (1996) 13 Cal.4th 92, 126 [51 Cal.Rptr.2d 770, 913 P.2d 980] ["Joinder is generally proper when offenses would be cross-admissible in separate trials, since an inference of prejudice is thus dispelled. [Citations.]"].) Evidence that defendant escaped would have been admissible in his separate murder trial as evidence indicating consciousness of guilt (*People v. Kipp, supra,* 26 Cal.4th at p. 1103; *People v. Williams* (1988) 44 Cal.3d 1127, 1143 [245 Cal.Rptr. 635, 751 P.2d 901]; *People v. Perry* (1972) 7 Cal.3d 756, 779 [103 Cal.Rptr. 161, 499 P.2d 129], disapproved on other grounds in part in *Green, supra,* 27 Cal.3d at pp. 28–34 ["escape may be probative of a consciousness of guilt"]), while the murder charge would have been admissible in his escape trial as the underlying felony charge pending when he fled. Because defendant did not suffer any prejudice stemming from the joinder of the two offenses, the trial court did not abuse its discretion in refusing to sever the charges.

Defendant, conceding that the evidence was cross-admissible, finds error in the trial court's failure to consider all of the factors cited in *Williams v. Superior Court, supra,* 36 Cal.3d at pages 454–457. We find no indication in the record that the trial court based its decision solely on the cross-admissibility of the evidence.

However, before dismissing defendant's claim in its entirety, we must determine if the joinder of the two charges " 'actually resulted in "gross unfairness" amounting to a denial of due process.' " (*People v. Mendoza, supra,* 24 Cal.4th at p. 162, quoting *People v. Arias, supra,* 13 Cal.4th at p. 127.)

As discussed above, the joinder of the escape charge was not prejudicial to defendant, and therefore could not have been "grossly unfair."

Finally, defendant points to cases holding that it is prejudicial to require a defendant to wear prison clothing at his trial because it undermines the presumption of innocence. He argues that consolidating the escape and murder charges, like wearing prison clothing, reminded the jury that he was in custody. As a result, he maintains that he was denied his Fifth and Sixth Amendment rights to due process and a fair trial. This argument is without merit.

The cases relied upon by defendant merely hold that a defendant may not be compelled to wear prison clothing during his or her trial. The reason, as correctly pointed out by defendant, is that such clothing serves as "a constant reminder" that the defendant is in custody. (*People v. Taylor* (1982) 31 Cal.3d 488, 494 [183 Cal.Rptr. 64, 645 P.2d 115].) But this rule has nothing to do with the facts of this case. Prison clothing reminds the jury of the defendant's custodial status, but at the same time has absolutely no probative value with respect to the merits of the case. Here, the escape evidence was probative of defendant's consciousness of guilt relating to the murder and did not serve as "a constant reminder" of defendant's custodial status. Moreover, the mere fact that the jury is made aware of a defendant's custodial status does not deprive the defendant of his constitutional rights. As we pointed out in *People v. Bradford* (1997) 15 Cal.4th 1229 [65 Cal.Rptr.2d 145, 939 P.2d 259], "in certain circumstances a jury inevitably will learn a defendant is in custody for the current charged offense, for example where the jury is presented with the testimony of a jailhouse informant." (*Bradford,* at p. 1336, [65 Cal.Rptr.2d 145, 939 P.2d 259], citing *People v. Alcala* (1984) 36 Cal.3d 604, 617 [205 Cal.Rptr. 775, 685 P.2d 1126].) This is equally true of evidence of an escape that is introduced to show consciousness of guilt.

### E. *Fourth Amendment Claim*

Pursuant to section 1538.5, defendant moved to suppress evidence of the Jennings .22-caliber handgun that was seized from the Monte Carlo when defendant was arrested. The prosecution objected, asserting that defendant lacked standing to object to the seizure of the gun because he was not the owner of the vehicle.[24] At the suppression hearing, defense counsel conceded that he could not offer evidence that defendant was either the owner or the driver of the vehicle, stating: "The best I would be able to articulate to the court as an offer of proof is that Mr. Valdez was a passenger in that particular

---

[24] Subsequent to the suppression motion, we observed in *People v. Ayala* (2000) 23 Cal.4th 225, 254, footnote 3 [96 Cal.Rptr.2d 682, 1 P.3d 3] that "[i]n the future, . . . mention of 'standing' should be avoided when analyzing a Fourth Amendment claim. [Citation.]"

vehicle." The trial court denied the motion to suppress without conducting an evidentiary hearing, finding that defendant lacked standing.

Defendant contends the trial court erred in concluding he did not have standing to challenge the seizure of the gun because he was not the owner of the vehicle in which the gun was found. Defendant maintains that the evidence introduced at the preliminary hearing supported the inference that he was the driver of the car or that he borrowed the car. But this contention is refuted by defense counsel's concession in the trial court that he could not offer proof that defendant was the owner or the driver of the car.

 A passenger in a vehicle may not challenge the seizure of evidence from the vehicle if the passenger asserts "neither a property nor a possessory interest in the automobile nor an interest in the property seized." (*Rakas v. Illinois* (1978) 439 U.S. 128, 148 [58 L.Ed.2d 387, 99 S.Ct. 421].) As a passenger, defendant lacked a reasonable expectation of privacy in the area under the driver's side seat and thus cannot challenge the seizure of the gun. (*Id.* at pp. 148–149.) The trial court therefore did not err in denying the motion to suppress.

### F. *Prosecutorial Misconduct*

Defendant asserts that numerous instances of prosecutorial misconduct deprived him of his state and federal constitutional rights to due process of law and a fair trial. To constitute a violation under the federal Constitution, prosecutorial misconduct must "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *People v. Prieto* (2003) 30 Cal.4th 226, 260 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15].) To be cognizable on appeal, a defendant " 'must make a timely objection at trial and request an admonition; otherwise, the [claim of prosecutorial misconduct] is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*Silva, supra,* 25 Cal.4th at p. 373, quoting *People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

### 1. *Eliciting Testimony of Defendant's Prior Convictions*

Defendant contends the prosecutor engaged in misconduct when she intentionally elicited testimony designed to reveal defendant's prior conviction. This, defendant argues, was in direct contravention of the trial court's ruling bifurcating the trial.

The complained-of reference to defendant's prior conviction occurred during the prosecutor's direct examination of Detective John Holtzberger regarding Macias's identification of defendant from a photographic lineup. Asked how he "managed to get [defendant's] photograph" in the lineup, Detective Holtzberger replied: "[Macias] told us that he knew Alfredo. . . . [¶] So at that time we felt we had a possible suspect and we then *went to the jail* and found a mug photo and put it in this mug photo lineup." (Italics added.)

Defendant failed to object at trial and, despite defendant's assertion that the misconduct here was "massive," we conclude that an admonition would have cured any prejudice. Detective Holztberger's fleeting reference to "jail" was not "so outrageous or inherently prejudicial that an admonition could not have cured it." (*People v. Dennis* (1999) 17 Cal.4th 468, 521 [71 Cal.Rptr.2d 680, 950 P.2d 1035] (*Dennis*).)

Even if this claim were not forfeited, we find no evidence of misconduct. The prosecutor merely asked Detective Holtzberger how he managed to get defendant's photograph in the photographic lineup, not necessarily where he got the photograph. The question appears directed at eliciting testimony regarding the reasons why Detective Holztberger included defendant's photograph in the lineup. This is partly evidenced by Detective Holztberger's response to the question. He did not immediately say he went to the jail, but gave the chain of information that led him to include defendant in the photographic lineup.

### 2. *Testifying While Questioning Witness*

In response to the prosecutor's question whether the prints found on the gun retrieved from the Monte Carlo could have been made in wet blood, Serologist Catalani responded: "Yes, it could be made while the blood was wet." In response, the prosecutor uttered: "Not under the blood or—You can't make it under the blood—Okay. Thank you, no further questions." Defendant claims this statement by the prosecutor constituted improper testimony based on the prosecutor's incorrect interpretation of the witness's statement.

Defendant did not object. Because an admonition could have cured any harm, this claim is forfeited. (*Dennis, supra,* 17 Cal.4th at p. 521; *People v. Earp, supra,* 20 Cal.4th at p. 858.) Moreover, there was no misconduct because, while the prosecutor may have been confused, she did not use any deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*Earp, supra,* 20 Cal.4th at p. 858.) Nor did the comment "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process" under the federal Constitution. (*Darden v. Wainwright, supra,*

477 U.S. at p. 181.) The prosecutor's isolated comment was not relied upon, or even mentioned, at any other part of the trial. Therefore, defendant's claim fails on the merits as well.

### 3. *Eliciting Testimony Regarding Defendant's Custody*

Prior to Officer Maxwell's testimony, defendant requested that the court order Officer Maxwell not to reveal that he interviewed defendant while defendant was in custody. Without objection from the prosecution, the court granted the request. The court instructed the prosecutor to "clean up" the testimony and also directly informed Officer Maxwell: "What we're just trying to do is keep the fact from the jury that at this stage of the proceedings the fact the defendant was incarcerated in state prison." Officer Maxwell replied, "I have no problem with that."

During the prosecution's direct examination of Officer Maxwell, the following colloquy took place:

"Q: Okay. Now did how did you start this interview? Did you—was it a question and answer? Was it a narrative? How did this interview—how was this interview conducted?

"A: I told him the case that I was investigating in regards to the homicide that occurred in the city of Pomona, and he—our first of the conversation was in regards to his prior contact with past investigators . . . *while he was at I believe Chino Institute*." (Italics added.)

Defense counsel immediately asked to approach the bench and moved for a mistrial. Finding no intentional misconduct, the trial court denied the motion.[25]

*Defendant asserts on appeal that the prosecutor intentionally elicited the reference to "Chino Institute" in violation of the court's order, undermining the presumption of innocence because it revealed his custodial status to the jury.* Preliminarily, we note that defendant has forfeited this claim because, although defense counsel objected to the testimony referring to Chino Institute, he rejected the trial court's offer to admonish the jury, stating: "I'd rather you didn't do that. Just let it go. Don't say a word." (See *Silva, supra,* 25 Cal.4th at p. 373 [finding claim of prosecutorial misconduct forfeited because defendant "after raising a timely objection, expressly declined the court's offer to admonish the jury. . . . Because an admonition would have

---

[25] Defense counsel also did not believe there was intentional misconduct, stating, "I just want the record to be clear that I do not think that it was an intentional act by the witness nor do I think it was an intentional act by [the prosecutor]. Those things happen."

cured any harm, the failure to request an admonition renders the claim of misconduct unreviewable"].) The isolated reference to Chino Institute was not so grave that a curative instruction would not have mitigated any possible prejudice to defendant. (See, e.g., *Dennis, supra,* 17 Cal.4th at p. 521.)

■ Even if this claim were not forfeited, we discern no misconduct on the part of the prosecutor. Although a prosecutor engages in misconduct by intentionally eliciting inadmissible testimony (*People v. Smithey* (1999) 20 Cal.4th 936, 960 [86 Cal.Rptr.2d 243, 978 P.2d 1171]), the record here reflects that the prosecutor did not intentionally solicit, and could not have anticipated, Officer's Maxwell's reference to Chino Institute. The prosecutor did not ask *where* Officer Maxwell interviewed defendant, but only how the interview was *conducted.* (See *People v. Pinholster* (1992) 1 Cal.4th 865, 943 [4 Cal.Rptr.2d 765, 824 P.2d 571] [rejecting defendant's claim of prosecutorial misconduct relating to the prosecution's questioning of a witness regarding prison gangs because "[t]here was neither an objection to this question nor a request for admonition, nor do we see any indication that the prosecutor asked the question for the purpose of eliciting an improper answer. [Citations.]"]; *id.* at pp. 964–965 ["there is no indication the prosecutor purposely elicited the [complained of] responses; rather she was pursuing legitimate lines of inquiry"].)

### 4. *Failure to Correct False or Misleading Testimony*

Defendant contends his federal due process rights were violated by the prosecutor's failure to correct false or misleading testimony given by Detective Terrio during cross-examination. During that examination, defense counsel asked Detective Terrio whether tennis shoes were found or seized during a search of defendant's home. Detective Terrio initially responded that he did not collect any tennis shoes, but in response to further questioning stated that he did not recall. He added, "at the time we made the search I was familiar with the characteristics or the design of this shoe print impression [left at the crime scene]. And the reason none of the shoes were seized or on [*sic*] taken would have been because they were not consistent with the pattern." Defendant argues this testimony was false and misleading because the inventory sheet signed by Detective Terrio, which was attached to the return of the search warrant, indicates that a pair of Nike tennis shoes was collected from defendant's home.

The Attorney General does not dispute defendant's assertion that Detective Terrio's testimony was false and misleading, but instead responds that the claim is forfeited because defendant did not object at trial, and even if not forfeited, it was incumbent on the defense, not the prosecution, to correct any false testimony.

We reject defendant's claim but for reasons other than those proffered by the Attorney General. The evidence introduced at trial fails to establish that Detective Terrio's testimony was false or misleading. No testimony was elicited during the trial that tennis shoes were seized from defendant's house.

The inventory sheet relied upon by defendant to support his contention is included in the clerk's transcript, but it was not introduced or relied upon at trial. We cannot, thus, determine on the record before us whether Detective Terrio's testimony was false or misleading because we cannot determine whether the entry in the inventory sheet regarding Nike tennis shoes was accurate. (See, e.g., *People v. Jones* (2003) 30 Cal.4th 1084, 1109 [135 Cal.Rptr.2d 370, 70 P.3d 359] [record on appeal insufficient to support defendant's claim].)

### 5. *Prosecutor's Theory That Defendant Destroyed Evidence*

Related to the above argument, defendant claims the prosecutor capitalized on Detective Terrio's false testimony during her closing argument when she deliberately argued a theory she knew to be false. He asserts that the prosecutor falsely argued that because the Nike tennis shoes retained by defendant after his arrest had never been found, the jury should infer that defendant destroyed them in order to conceal evidence linking him to the crime scene. As discussed above, defendant claims that the prosecutor was aware that defendant's Nike tennis shoes were seized by Detective Terrio and her use of his testimony "constituted a knowing use of false or perjured testimony." Since defendant's Nike tennis shoes were in fact seized during the May 4, 1989 search conducted by Officer Terrio, defendant contends such an argument violated his constitutional rights.

As with defendant's false testimony claim, we find no misconduct because no evidence was introduced at trial that Nike tennis shoes were recovered from defendant's house. Furthermore, reading the prosecutor's and defense counsel's closing arguments in their entirety, we find no misconduct. The prosecutor told the jury that when defendant was arrested he was wearing a pair of Nike tennis shoes, which the evidence showed he retained, and the police never got custody of them. She then asked rhetorically: "Coincidence? I don't know . . . ." During her rebuttal, in response to defense counsel's argument that the police had possession of defendant's Nike tennis shoes but had not compared the impression to the one at the crime scene,[26] the prosecutor argued: "Counsel indicated that [defendant's] Nike shoes were taken into evidence. They were not. On the booking slip the blue Nikes were

---

[26] Defense counsel was referring to the pair of Nike tennis shoes defendant was wearing when he was arrested, not the pair seized from defendant's house. As to the latter pair, defense counsel argued that Detective Terrio did not seize them because they did not match the shoe impressions left at the crime scene.

retained by the prisoner. There's no evidence before you that he was in custody at the time of May 4th, 1989, when the search warrant was done at his house. *There were no Nike shoes matching the tread mark that Detective Terrio was looking for at the house.* The defendant wasn't there. His tennis shoes were not there." (Italics added.)

According to the evidence introduced at trial the prosecutor's argument was not false or misleading. Because the inventory sheet was not admitted into evidence, we are unable to determine if the prosecutor was incorrect in arguing that no matching Nike tennis shoes were discovered at defendant's house. (See *People v. Jones, supra,* 30 Cal.4th at pp. 1109–1110.) This "issue depends upon proof in a habeas corpus proceeding" that the Nike entry in the inventory sheet was accurate, and that the prosecutor knew or should have known about it. (*Id.* at p. 1110.)

The remainder of the prosecutor's argument did not constitute misconduct because the statements were factually correct. There was no evidence that the pair of Nike tennis shoes listed in the inventory sheet is the same pair of Nike shoes defendant was wearing when he was arrested.

### 6. *Comment on Defendant's Failure to Testify*

Defendant contends that the prosecutor improperly commented on defendant's failure to testify. (*Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) Defendant forfeited this claim because he failed to object. (*People v. Medina* (1995) 11 Cal.4th 694, 756 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

It is well established, however, that "the rule prohibiting comment on defendant's silence does not extend to comments on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Medina, supra,* 11 Cal.4th 694, 755.) The prosecutor's remarks, viewed in context, can only be seen as a fair comment on the state of the evidence, comment falling outside the purview of *Griffin.* The prosecutor merely pointed out that "There's no evidence presented . . . of any justification for murdering this man. There was no evidence of self-defense, there's no evidence he was trying to kill somebody else." The prosecutor then concluded her thought by stating rhetorically, "[t]herefore, Ladies and Gentlemen, because we don't have any evidence that it was lawful, obviously the contrary is true. It was unlawful." These remarks contained no references, express or implied, to defendant's silence at trial, and therefore were not improper. (*Medina, supra,* at p. 756.)

### G. *Denial of Mistrial Motion*

Defendant contends the trial court abused its discretion and deprived him of his constitutional right to a fair trial when it denied his motion for a mistrial following Officer Maxwell's reference to "Chino Institute." We review a trial court's ruling on a motion for mistrial for abuse of discretion. (*People v. Ayala, supra,* 23 Cal.4th at p. 283.) Such a motion should only be granted when a defendant's "chances of receiving a fair trial have been irreparably damaged." (*Ibid.*) We held above that the mere mention of "Chino Institute" by Officer Maxwell did not amount to prosecutorial misconduct. Because there was no misconduct on the part of the prosecutor and the reference to "Chino Institute" was brief and isolated, the trial court properly denied the motion for mistrial. In *People v. Bolden, supra,* 29 Cal.4th 515, a case involving a similar situation, we upheld the trial court's denial of a motion for mistrial, finding it "doubtful that any reasonable juror would infer from the [witness's] fleeting reference to a parole office that defendant had served a prison term for a prior felony conviction." (*Id.* at p. 555.) The witness, a police officer, was instructed not to mention "parole office" during his testimony. The prosecutor, referring to defendant's address, asked the officer, "where was that?" In response, the officer stated, "It was at the Department of Corrections parole office . . . ." (*Ibid.*) The prosecutor, as in this case, assured the court he was taken by surprise by the officer's response.

### H. *Cumulative Error*

Defendant contends that the cumulative effect of any guilt phase errors requires reversal, even if no single error alone would warrant such a result. We find no cumulative effect requiring reversal.

## IV. PENALTY PHASE ARGUMENTS

### A. *Reliability of Penalty Phase Determination*

Defendant, relying solely on his guilt phase argument regarding the sufficiency of the evidence to support the felony-murder conviction and the robbery-murder special-circumstance finding, contends without further argument that his Eighth Amendment right to a reliable penalty determination was violated. Because we have concluded above that sufficient evidence supported both the conviction and the special circumstance finding, we reject this argument as well.

### B. *Lingering Doubt and Exclusion of Evidence of Third Party Culpability*

Defendant contends the trial court's exclusion at the guilt phase of third party culpability evidence relating to Liberato Gutierrez prejudicially affected

the penalty verdict depriving him of his federal constitutional rights to a fair trial and nonarbitrary penalty determination. As with defendant's guilt phase argument, we reject this claim because defendant did not rely on a theory of third party culpability in his offer of proof. Defense counsel was very clear that it was not his intention to "point[] the finger" at Liberato Gutierrez. (See *ante*, at pp. 106–109.)

Even so, as defendant concedes, the trial court instructed the jury on lingering doubt.[27] Defendant's assertion that the lingering doubt instruction was ineffective is undermined by Detective Guenther's testimony and defense counsel's argument, which alerted the jury to the possibility that other individuals were in the vicinity before, during, or after the murder and robbery. Defense counsel, for example, argued to the jury during his guilt phase closing argument that other individuals could have killed or robbed the victim, arguing at one point: "In the back alley . . . are other people that are found, that are detained, that are talked to. Guenther knows they're back there. He talked to them. [¶] Were those people's shoes gathered up? Were those people's shoes taken? Were those people's shoes analyzed? Were those people's shoes looked at for blood?"

Defendant's reliance on the United States Supreme Court's decision in *Lockett v. Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954] is misplaced. *Lockett* struck down Ohio's death sentence statute because it prevented the sentencer from "giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense *proffered in mitigation*." (*Id.* at p. 605, italics added.) Defendant here, however, did not seek to introduce third party culpability evidence at the penalty phase as mitigating evidence. (See e.g., *People v. Hawkins* (1995) 10 Cal.4th 920, 967 [42 Cal.Rptr.2d 636, 897 P.2d 574], abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101 [96 Cal.Rptr.2d 441, 999 P.2d 666] [finding that since defendant did not seek to introduce lingering doubt at the second penalty phase trial he could not complain of any state law violation].)[28]

---

[27] CALJIC No. 2 instructs: "You may consider as a mitigating factor any 'lingering doubt' that you may have concerning the defendant's guilt. Lingering or residual doubt is defined as that state of mind between a reasonable doubt and beyond all possible doubt."

[28] Although the trial court gave a lingering doubt instruction in this case, a trial court is not required to do so as a matter of state or federal law (see *Franklin v. Lynaugh* (1988) 487 U.S. 164, 173–174 [101 L.Ed.2d 155, 108 S.Ct. 2320]; *People v. Staten* (2000) 24 Cal.4th 434, 464 [101 Cal.Rptr.2d 213, 11 P.3d 968]; *People v. Millwee* (1998) 18 Cal.4th 96, 165–166 [74 Cal.Rptr.2d 418, 954 P.2d 990] [no state or federal right to jury instruction on lingering doubt]; *People v. Hawkins, supra,* 10 Cal.4th at p. 967 ["contrary to defendant's contention, a capital defendant has no federal constitutional right to have the jury consider lingering doubt at the penalty phase"].)

### C. *Joinder of Escape Charge*

Defendant contends the joinder of the escape charge with the robbery-murder charge deprived him of a fair trial and nonarbitrary penalty determination. He maintains that the escape evidence may have been the most important factor in the jury's decision to sentence him to death. This claim lacks merit. As we explained above, the joinder of the escape charge and the murder charge was not prejudicial because evidence of the escape would have been admissible as evidence of consciousness of guilt had the charges been tried separately. And contrary to defendant's assertion, evidence of the scuffle between defendant and Deputy Guise was admissible and relevant at the penalty phase as evidence of criminal activity involving force or violence under section 190.3, factor (b).

### D. *Allegedly Improper Rebuttal Evidence*

Several defense witnesses, including defendant's sister Victoria Valdez (Victoria), testified that defendant was a nonviolent person and that it was difficult for them to believe that he was capable of killing another person. On cross-examination of Victoria, the following colloquy occurred:

"[Prosecutor]: And you tell us that your brother is not a violent man; is that correct?

"[Victoria]: Not in front of us he's not.

"[Prosecutor]: Have you ever seen your brother with a weapon, like a gun?

"[Victoria]: No, never.

"[Prosecutor]: And it would be your opinion that your brother never had guns, never touched guns. Is that pretty good?

"[Victoria]: I guess that's pretty good. I have never seen him with a gun.

"[Prosecutor]: Would you be really surprised if your brother hung around and had—somewhere and had guns?

"[Victoria]: Yes, I would be surprised."

At this point, the prosecutor showed Victoria two photographs, one of defendant posing with a long gun and making hand gestures and the other of defendant and another person holding the gun. The prosecutor then asked Victoria: "So this is a picture of your yard area with him doing something

with his hands? Do you see what's he doing with his hand there? Can you tell?" Victoria responded, "He's going like this (motioning)." The prosecutor elaborated: "Doing something with his hands, okay." Defense counsel did not object to this questioning.

When the prosecution later sought to introduce the photographs into evidence, defense counsel objected, but objected only to the one photograph depicting "signing[, the] gang signing." The following exchange then took place outside the presence of the jury:

"[Prosecutor]: There was no testimony about the gang signs.

"[Defense counsel]: I know, but that doesn't mean that you're not going to argue—

"[Prosecutor]: I'm not going to argue gang signs. I can't. There's no evidence. . . . [¶] Also, I have a good faith belief that that's not a recognized gang sign. Every gang sign expert I talk to says he made this up.

"[Defense counsel]: If that's the case—

"[Prosecutor]: I'm not going to argue that."

As a result of the prosecutor's assurance that she did not intend to make an argument regarding gang signs, the court admitted the photographs, stating that they would be received into evidence because "the people will not argue that issue of whether or not they're flashing a gang sign."

Defendant argues on appeal that his constitutional rights to a fair trial and reliable penalty determination were violated by the admission of the photographs and the prosecutor's cross-examination of defendant's sister relating to the gun and the hand gestures. Because defendant did not object at trial, he may not now complain on appeal about the prosecutor's cross-examination. (*People v. Ochoa* (1998) 19 Cal.4th 353, 453 [79 Cal.Rptr.2d 408, 966 P.2d 442] ["Defendant was required to object to the improper question so that the court could admonish the jury to disregard it and the answer. He did not, and has waived his claim."].) Even if this claim was not forfeited, the questioning was within proper bounds. The prosecution was permitted to counter the defense witnesses' portrayal of defendant. Testimony regarding the gun countered testimony that defendant could not have committed the crime he was found guilty of, and that Victoria, who lived with her brother when the photograph was taken, had never before seen him with a gun. It also pointed out that Victoria may have been unaware of her brother's activities.

The prosecutor's inquiry into the hand gestures, although questionable as to its relevance, was not prejudicial. While the prosecutor subsequently informed the court and defense counsel that she did not think the gestures were authentic gang signs, she may have believed that defendant's sister may have had another insight. Whether or not this was the case is not important since the reference to the hand gestures was too fleeting to be prejudicial.

The admission of the photographs into evidence was also permissible because defense counsel implicitly withdrew his objection. As noted above, defense counsel objected when the prosecutor first sought their admission, but only to the one photograph showing the hand gestures. However, defense counsel was concerned not with the admission of the photograph per se, but only with its admission in conjunction with a prosecution argument to the jury regarding gang signs. After the prosecutor assured defense counsel that she was not going to so argue, he stated, "If that's the case—" at which time he was cut off by the prosecutor who reassured him that she was not going to make an argument respecting gang signs. A reading of this testimony reveals that defense counsel was only concerned about a subsequent argument by the prosecutor regarding gang signs. Because he was assured that no such argument would take place, he did not object to the admission of the photograph.

Finally, we note there was never any testimony relating to gang membership or any mention of the word "gang." We conclude defendant's constitutional rights were not violated by this testimony and the admission of the photographs into evidence.

### E. *Prosecutorial Misconduct*

Defendant contends that his federal constitutional rights to due process, fair trial, and reliable penalty determination were violated by prosecutorial misconduct at both the guilt and penalty phases. Such misconduct, he urges, requires reversal of the death sentence. We disagree.

The same standard applicable to prosecutorial misconduct at the guilt phase is applicable at the penalty phase. (See *Cunningham, supra,* 25 Cal.4th at p. 1019.) A defendant must timely object and request a curative instruction or admonishment. Failure to do so forfeits the claim on appeal unless the admonition would have been ineffective. (*Ibid.*)

Moreover, when misconduct has been established, it "must bear a reasonable possibility of influencing the penalty verdict. [Citations.] In evaluating a claim of prejudicial misconduct based upon a prosecutor's comments to the jury, we decide whether there is a reasonable possibility that the jury

construed or applied the prosecutor's comments in an objectionable manner. [Citations.]" (*Cunningham, supra,* 25 Cal.4th at p. 1019.)

Because defendant did not object to any of the complained-of instances of misconduct, and a curative instruction or admonition could have mitigated any prejudice, his claims are forfeited. But even if not forfeited, defendant's contentions are without merit.

### 1. *Prosecutor's Argument Regarding Motivations of Mitigating Witnesses*

Defendant first contends that the prosecutor's comments during closing argument relating to the motivation of his two sisters was improper because it mischaracterized the evidence and amounted to deliberate misrepresentation, thereby resulting in prejudicial misconduct.

The prosecutor made the following argument: "The most convincing testimony that this defendant should be sentenced to the death penalty came from both his sisters, Victoria and Graciela. They didn't shed a tear for him. They didn't beg for his life, for—for mercy for anyone, not even for themselves. They were somewhat lighthearted, noncommittal, and it didn't appear that they truly meant it when they said he was a good and nonviolent man. [¶] They're [*sic*] demeanor indicated, to the People at least, that they were supportive of their brother, but because they really, really know just how bad he, [*sic*] is because they lived with him and perhaps could not tell us the things that they really knew, that they testified out of family commitment. They testified for Mr. and Mrs. Valdez and not for him. [¶] They couldn't bring themselves to beg for his life because they know in their heart he doesn't deserve mercy. The two women said it all. They're not criminals. These are hard working people with children. [¶] . . . [¶] But I'll tell you, these women know what Alfredo Valdez is, and they're not happy about it. To come to court and have to beg for somebody because their parents want them to, because he's your brother, you got to do it, Ladies and Gentlemen. I would expect nothing less from anybody else. [¶] You would want your brother to come. You would want your sister to come. But they're probably so sick, both of them, it probably doesn't cause either sister an inordinate amount of grief to think at all about one of their brothers, Alfredo, facing the death penalty. Their actions and demeanor tell us, and they tell you he deserves it."

While counsel is accorded "great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation]," counsel may not assume or state facts not in evidence (*Cash, supra,* 28 Cal.4th at p. 732) or mischaracterize the evidence (*People v. Hill*

(1998) 17 Cal.4th 800, 823 [72 Cal.Rptr.2d 656, 952 P.2d 673]). " 'Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Farnam* (2002) 28 Cal.4th 107, 169 [121 Cal.Rptr.2d 106, 47 P.3d 988], quoting *Dennis, supra,* 17 Cal.4th at p. 522.)

▮ In this case, the prosecutor's comments did not mischaracterize or assume facts not in evidence, but merely commented on the evidence and made permissible inferences. (*People v. Rowland* (1992) 4 Cal.4th 238, 278 [14 Cal.Rptr.2d 377, 841 P.2d 897] [prosecutor's argument that the defendant's mother "couldn't bring herself to tell [the jury] that he didn't deserve the death penalty . . . [but only that] her religion says that there shouldn't be a death penalty" amounted to fair comment on the evidence].) The prosecutor here did not misstate the witnesses' testimony or state that the witnesses did not ask the jury not to impose the death penalty. Rather, it is clear that the argument was based on the prosecutor's interpretation of the evidence—e.g., the witnesses' tepid testimony, their demeanor, and their relationship to defendant. (See, e.g., *People v. Pinholster, supra,* 1 Cal.4th at p. 964 [no prosecutorial misconduct in prosecutor's comment that " '[e]ven the most heinous person born, even Adolph [*sic*] Hitler, probably had a mother who loved him.' . . . [Because a] reasonable juror would understand the comment as attempting to diminish the weight of defendant's evidence in mitigation, that is, the evidence of his mother's attachment to him. [Citation.]"].)

Moreover, there was no danger that the jurors believed the prosecutor was aware of facts to which they were not privy. (Cf. *People v. Hill, supra,* 17 Cal.4th at p. 829 [improper argument because it "raised the possibility the jury would assume [the prosecution] had some undisclosed knowledge"].)

Given this, there is no reasonable basis to conclude the prosecutor's argument skewed the jury's decision toward imposing the death sentence or diminished the jury's sense of responsibility. (*Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633].)

In passing, defendant contends that counsel's failure to object amounted to ineffective assistance of counsel. Because we find that the argument was a permissible comment on the evidence, this claim also is without merit.

Finally, we note that any possible prejudice was mitigated by the court's instruction to the jury that "[s]tatements made by the attorneys during trial are not evidence." (See *Cash, supra, 28 Cal.4th at p. 734.*)

### 2. *Misconduct in Cross-examining Witness Regarding Hand Gestures*

Defendant contends that the prosecutor engaged in misconduct when she questioned Victoria about defendant's hand gestures. Defendant argues that

this invited the jury to speculate that defendant was a gang member, despite the fact that the prosecutor was aware that the hand gestures were not identifiable gang signs. Even if this claim were not forfeited for failure to object at trial, we would reject this claim on the merits because the prosecutor never asked Victoria whether defendant was making gang signs, but only asked what he was doing with his hands. The word "gang" was never uttered during defendant's trial. Again, as observed above, the prosecutor may have believed that Victoria had some insight into what the hand gestures meant.

### 3. *Intimidation of Potential Penalty Witnesses*

Through the testimony of Deputy Sheriffs Whipple and Shive, the prosecution introduced evidence that defendant attacked inmate Robinson. Robinson did not testify, but he was brought into the courtroom for identification purposes.

In her closing argument, the prosecutor stated: "It goes without saying that, in a custodial setting like county jail, and perhaps even more so, state prison, no one wants to be labeled a rat. No one wants to inform on anyone because the next time something happens to you, it will probably involve a lot more pain and suffering to you, a rat. [¶] . . . [¶] Now, you remember that [defense counsel] asked Deputy Whipple about—asked him if Mr. Robinson would testify, and he said no, he didn't want to. Even the prison guards testified, and I think it was Officer Valentine, but I'm not really sure, testified that it's very common to have intimidation."

The prosecutor continued: "Now, let's talk about the stabbing of William Robinson. You saw him. He didn't want to testify. You saw how big and buffed out he was. Alfredo Valdez is nowhere near his size, but he stabbed him twice and he was causing him to back up in an intimidating fashion in front of deputies."

Defendant contends this argument implied the reason Robinson did not testify was because defendant intimidated him. This was misconduct, defendant argues, because there was no evidence that defendant intimidated Robinson.

We find no misconduct. The prosecutor never said or implied that defendant himself intimidated Robinson. She merely highlighted that inmates can be intimidated in prison and that an inmate would not want to be labeled a "rat." Any inmate could consider Robinson a "rat" if it was disclosed that he testified against another inmate. With respect to the prosecutor's argument regarding Robinson's size, there was no misconduct. A fair reading of the argument reveals that the prosecutor intended to show that regardless of defendant's size, he could still pose a threat to other inmates, even those who are "buffed out."

Defendant also argues that the prosecution committed similar misconduct with respect to another witness, William Copeland. But he fails to cite any argument by the prosecution implying that defendant intimidated Copeland.

### 4. *Guilt Phase Misconduct*

Defendant next argues that misconduct at the guilt phase also prejudiced him at the penalty phase. We reject this claim for the same reasons we rejected his guilt phase prosecutorial misconduct claims. (See *ante*, at pp. 122–127.)

### 5. *Cumulative Impact of Prosecutorial Misconduct*

Without a single instance of prosecutorial misconduct, we cannot conclude there was cumulative prejudicial impact depriving defendant of a fair trial and due process. (Cf. *People v. Hill, supra,* 17 Cal.4th at p. 815 [reversing verdict based on numerous instances of egregious prosecutorial misconduct].)

### F. *CALJIC No. 2.06*

During discussion regarding jury instructions between counsel and the court, the following colloquy occurred regarding CALJIC No. 2.06:[29]

"[Prosecutor]: Let me look at 2.06, because there may be—the argument may be that [defendant] attempted to suppress evidence by concealing the knife in the prison yard.

"Court: Perhaps by the intimidation of a witness, too.

"[Prosecutor]: Right. And there is that one witness that didn't want to testify.

"Court: Robinson.

"[Prosecutor]: Yes.

"Court: Let's give that one anyway, 2.06."

---

[29] CALJIC No. 2.06 reads: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by the intimidation of a witness or by destroying evidence or by concealing evidence, such an attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

Defendant argues that it was prejudicial error to instruct the jury pursuant to CALJIC No. 2.06 because there was no evidence that he intimidated Robinson into not testifying. Giving this instruction, he maintains, lessened the prosecution's burden of proof by allowing the jury to infer "guilt" regarding the attack on Robinson, which was introduced in aggravation as an uncharged criminal act under section 190.3, factor (b). This, he urges, violated his constitutional rights to a fair trial and reliable penalty determination.[30]

As a threshold matter, we find that defendant forfeited this claim because he did not object at trial. (*People v. Bolin* (1998) 18 Cal.4th 297, 326 [75 Cal.Rptr.2d 412, 956 P.2d 374], citing *People v. Jackson* (1996) 13 Cal.4th 1164, 1223 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Defense counsel did not object to the court's ruling at the time it was made, or later when the court asked whether defense counsel had any requests or objections to the proposed instructions on behalf of defendant.

Turning to the merits, we disagree with the Attorney General that sufficient evidence existed to support CALJIC No. 2.06. "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." (*People v. Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203], citing *People v. Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) Here, the evidence surrounding Robinson's refusal to testify was insufficient to allow the jury to infer that defendant intimidated Robinson.

Prior to Deputy Whipple's scheduled testimony, the prosecutor informed the court: "[S]ome unforeseen occurrences have taken place, and I have spoken with counsel. We'd like to take Deputy Whipple very briefly out of order to identify an individual." With the court's permission and without objection from defense counsel, the prosecutor called Deputy Whipple as a witness for the sole purpose of identifying Robinson, who was brought into the courtroom.

---

[30] Defendant does not contend that the court erred in giving CALJIC No. 2.06 at the penalty phase, where the jury was no longer considering the issue of defendant's guilt of a charged offense. (See, e.g., *People v. Rowland, supra,* 4 Cal.4th at p. 282.) Although CALJIC No. 2.06 includes the word "guilt," it is clear from the context in which it was given in this case, and defendant's argument on appeal, that it was intended to apply to the jury's determination whether defendant attacked Robinson, and therefore constituted a factor in aggravation under section 190.3, factor (b). (Cf. *Rowland, supra,* 4 Cal.4th at p. 282, fn. 20 ["It is true that at the penalty phase, the jury was required to determine whether defendant was 'guilty' of certain 'other crimes.' But the record does not reveal any efforts to suppress evidence as to such offenses."].)

Deputy Whipple was recalled the next day. He testified that he talked to Robinson the day he was stabbed and that Robinson was cooperative. After eliciting from Deputy Whipple that he had "conversations" with Robinson, the prosecutor asked: "[A]t this point was he cooperative with you about testifying?" Before Deputy Whipple answered, defense counsel's objection on vagueness grounds was sustained. The prosecutor then asked Deputy Whipple if he had gone to talk to Robinson in "lock-up" two days earlier; Deputy Whipple said yes. He also answered in the affirmative when the prosecutor asked if his purpose was to see if Robinson would testify. Deputy Whipple testified that he was unsuccessful in his attempt, but did not elaborate.

This testimony would not have allowed a reasonable jury to find that defendant intimidated Robinson or that Robinson's refusal to testify was related to something defendant may have said or done. Deputy Whipple never said why Robinson did not wish to testify, only that he seemed cooperative prior to his scheduled testimony. Even if Robinson was intimidated, as we explained above in our review of defendant's prosecutorial misconduct claim (see *ante*, at pp. 134–136), the source of the intimidation could have been other inmates who may have taken exception to an inmate's testifying against another inmate. Robinson may have decided that he did not want to be labeled a "rat." (See, *ante*, at p. 135.) The jury, therefore, should not have been permitted, based on witness intimidation, to find that defendant exhibited consciousness of guilt by suppressing evidence of his attack on Robinson.

 Although we conclude that the trial court erred in instructing the jury in the language of CALJIC No. 2.06, we discern no prejudice to defendant warranting reversal of the death judgment. Defendant argues that this error lessened the prosecutor's burden of proof relating to the uncharged Robinson attack. But as we have previously held, CALJIC No. 2.06 and other consciousness of guilt instructions do not impermissibly lessen the prosecution's burden of proof. (*People v. Jackson, supra,* 13 Cal.4th at p. 1224.) Before the jury could rely on defendant's attack on Robinson as a factor in aggravation at the penalty phase, the prosecutor was required to prove beyond a reasonable doubt that defendant did attack Robinson. (*People v. Sapp* (2003) 31 Cal.4th 240, 293 [2 Cal.Rptr.3d 554, 73 P.3d 433].) Through the testimony of Deputies Whipple and Shive, there is little doubt the prosecution was able to do so. Deputy Shive's eyewitness testimony was essentially uncontroverted. At most, the defense was able to elicit from Deputy Shive that he could not be certain that defendant was the one who actually manufactured the shank that Deputy Shive found when he searched defendant.

Moreover, any possible prejudice was mitigated by the admonition contained in CALJIC No. 2.06 that "such conduct is not sufficient by itself to

prove guilt, and its weight and significance, if any, are matters for your consideration." There is no reasonable possibility, given the extent of the aggravating evidence introduced at the penalty phase overall, and the testimony of Deputies Whipple and Shive regarding the attack on Robinson specifically, that the penalty determination would have been different had the jury not been instructed pursuant to CALJIC No. 2.06. (*People v. Pinholster, supra,* 1 Cal.4th at p. 966.) Therefore, any error was harmless.

### G. *Challenges to Death Penalty Law*

Defendant argues that the robbery-murder special circumstance, facially and as applied, violates the Eighth Amendment to the United States Constitution because it fails to adequately narrow the class of death-eligible defendants and vests prosecutors with unbridled discretion. We have repeatedly rejected such contentions (see, e.g., *People v. Snow* (2003) 30 Cal.4th 43, 125–126 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Ochoa, supra,* 26 Cal.4th at p. 462; *Cunningham, supra,* 25 Cal.4th at p. 1041; *People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Arias, supra,* 13 Cal.4th at pp. 189–190) and find no need to reconsider our precedent at this time.

Defendant further contends that federal due process requires that before returning a verdict of death the jury must find beyond a reasonable doubt that aggravating factors outweigh mitigating factors and that death is the appropriate penalty. We have repeatedly rejected these contentions. (See *People v. Jones, supra,* 30 Cal.4th 1084; *People v. Kraft, supra,* 23 Cal.4th at p. 1078.) The United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] do not require that we reconsider our precedent. (*People v. Snow, supra,* 30 Cal.4th at p. 126, fn. 33.)

### H. *Cumulative Error*

We reject defendant's contention that the cumulative effect of any errors requires that this court reverse the death judgment. We reject this claim because none of the errors, individually or cumulatively, " 'significantly influence[d] the fairness of defendant's trial or detrimentally affect[ed] the jury's determination of the appropriate penalty.' " (*Cunningham, supra,* 25 Cal.4th at p. 1038, quoting *People v. Sanchez* (1995) 12 Cal.4th 1, 84 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)

## CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Baxter, J., and Werdegar, J., concurred.

**CHIN, J.**—I respectfully dissent. The majority opinion holds that the trial court had no sua sponte duty to instruct on the lesser included offense of second degree murder because there was no substantial evidence to support such an instruction. (Maj. opn., *ante*, at pp. 114–119.) I disagree. On this record, the jury could have reasonably concluded that defendant fatally shot the victim, but have had reasonable doubts as to whether defendant Alfredo Reyes Valdez robbed the victim or killed him for the purpose of robbing him. Because the instructions gave the jury no alternatives other than first degree robbery murder or acquittal, it was faced with an unwarranted all-or-nothing choice on the charged offense. The prejudicial effect of this instructional error was further amplified by: (1) another instruction given—which failed to distinguish the first degree felony-murder charge from the robbery-murder special-circumstance allegation, and (2) an evidentiary error—which denied the defense evidence that the police found and arrested another person at the crime scene *with blood* on his clothing. Because I cannot conclude that the trial court's failure to instruct on second degree murder was harmless, I would reverse the guilt judgment and remand the case to give the People the option of retrying defendant or accepting a second degree murder conviction. (*People v. Edwards* (1985) 39 Cal.3d 107, 118 [216 Cal.Rptr. 397, 702 P.2d 555].)

## I. FAILURE TO INSTRUCT ON SECOND DEGREE MURDER[1]

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses *when the evidence raises a question as to whether*

[1] The Attorney General argues that second degree murder is not a lesser included offense of felony murder because malice—an element of second degree murder—is not an element of felony murder. Here, at the very least, second degree murder was a lesser included offense under the accusatory pleading test. (*People v. Clark* (1990) 50 Cal.3d 583, 636 [268 Cal.Rptr. 399, 789 P.2d 127].) The amended information alleged that, defendant "willfully, unlawfully, and *with malice aforethought* murder[ed] ERNESTO MACIAS, a human being" "in violation of PENAL CODE SECTION 187(a), a Felony . . . ." (Italics added.)

*all of the elements of the charged offense were present* [citation], *but not when there is no evidence that the offense was less than that charged.* [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (*Breverman*), italics added.)

In other words, a trial court errs if it fails to instruct, sua sponte, on lesser included offenses that find substantial support in the evidence. (*Breverman, supra,* 19 Cal.4th at p. 162.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*)[2]

In finding that there was no substantial evidence the killing was other than robbery murder, the majority states: "At most, defendant raises the issue of sufficiency of the evidence relating to the robbery, and from that would have us hold that he acted with malice in killing defendant and he could, therefore, have been found guilty of second degree murder . . . ." (Maj. opn., *ante,* at p. 116.) The majority misconstrues defendant's argument as well as the substantial evidence test in the context of lesser included offense instructions. The issue is *not* whether the robbery evidence was sufficient to sustain the robbery-felony-murder conviction, but whether a jury *could have reasonably concluded* that defendant committed second degree murder but not robbery felony murder. (See *Breverman, supra,* 19 Cal.4th at p. 162.)

Preliminarily, I do not dispute that there is substantial evidence to support the first degree felony-murder conviction. (See maj. opn., *ante,* at p. 104.) In the context of determining whether substantial evidence supports the jury's actual verdict, we—as an appellate court—must review the whole record in the light most favorable to the prosecution to determine

---

[2] I agree with the majority that defendant did not invite the error with respect to second degree murder instructions. (Maj. opn., *ante,* at p. 115; *People v. Cooper* (1991) 53 Cal.3d 771, 830–831 [281 Cal.Rptr. 90, 809 P.2d 865]; see also *People v. Barton* (1995) 12 Cal.4th 186, 198 [47 Cal.Rptr.2d 569, 906 P.2d 531] ["[t]he doctrine of invited error does not . . . *vindicate* the decision of a trial court to grant a defendant's request not to give an instruction that is otherwise proper: the error is still error"].) I also note that, on appeal, defendant does not claim ineffective assistance of counsel for failure to request second degree murder instructions. Because the record does not reveal why defense counsel failed to request the instructions and defendant does not raise an incompetence claim, I do not speculate whether counsel had a tactical purpose or whether counsel even considered second degree murder instructions.

whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) In addition, we must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Ibid.*)

Here, ample evidence exists to support the jury's finding that defendant shot the victim. Defendant's palm print, made in wet blood that was consistent with that of the victim, was discovered on a Jennings .22-caliber handgun only one day after the shooting. Although the handgun holds a total of seven rounds, only three were left in the handgun when found by the police. The victim had been shot four times. Defendant was last seen alone with the victim, who was then fatally shot within a 10-minute window of opportunity. The jury could reasonably conclude that defendant used four of the bullets in the handgun to shoot the victim, with three rounds remaining. Moreover, defendant lied to the police about the handgun found in the car, denying knowledge of its existence and having touched it.

The evidence of robbery was weaker, but enough to support the jury's finding that defendant killed the victim during the commission of a robbery. As the majority explains, the victim had cashed a $1,200 check two days before the killing; the victim boasted, in defendant's presence, that he was going to Mexico the next morning and was taking $3,000 with him; defendant was the last person seen with the victim; when the police arrived, they found the victim's left pants pocket turned inside out, with apparent bloodstains on the interior of the pocket. The $1,200 or $3,000 was never recovered and defendant, who was unemployed, had $100 on his person when he was arrested the next day. (Maj. opn., *ante*, at p. 104.) Viewing the circumstantial evidence in the light most favorable to the prosecution, the jury could infer that defendant robbed the victim. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618] [appellate court must accept logical inferences that jury might have drawn from the circumstantial evidence even if court would have concluded otherwise].)

But the issue here—regarding the duty to instruct on a lesser included offense—is very different than the mere question whether substantial evidence supports conviction of the greater offense. Unlike an appellate court, a jury is *not* required to view the evidence in the light most favorable to the prosecution. It is free to accept all, none, or some of the evidence in support of the prosecution's case; the same is true for evidence in support of the defense case. (See *People v. Jeter* (1964) 60 Cal.2d 671, 675–676 [36 Cal.Rptr. 323, 388 P.2d 355] [second degree murder issue squarely posed if jury believed only that portion of the defendants' testimony that negated

commission of robbery, but accepted the prosecution's testimony in all other respects].) It is within the province of the jury to assess and weigh all of the evidence independently. Thus, the issue here is whether the *jury*—in assessing and weighing the evidence independently—*could have reasonably concluded* that defendant committed second degree murder, but not first degree robbery murder. The issue is *not*, as the majority seems to suggest, whether substantial evidence exists to support the robbery-murder conviction or whether the jury reasonably found first degree robbery murder on this record.

If the evidence established as a matter of law that defendant committed first degree felony murder, the trial court did not err in failing to instruct the jury on second degree murder. "Where the evidence points *indisputably* to a killing committed in the perpetration of one of the felonies [Penal Code] section 189 lists, the *only* guilty verdict a jury may return is first degree murder. (*People v. Jeter* (1964) 60 Cal.2d 671, 675 [36 Cal.Rptr. 323, 388 P.2d 355]; *People v. Lessard* (1962) 58 Cal.2d 447, 453 [25 Cal.Rptr. 78, 375 P.2d 46]; *People v. Perkins* (1937) 8 Cal.2d 502, 516 [66 P.2d 631].) Under these circumstances, a trial court 'is justified in withdrawing' the question of degree 'from the jury' and instructing it that the defendant is either not guilty, or is guilty of first degree murder. (*People v. Riser* (1956) 47 Cal.2d 566, 581 [305 P.2d 1].) The trial court also need not instruct the jury on offenses other than first degree felony murder or on the differences between the degrees of murder. (*People v. Rupp* (1953) 41 Cal.2d 371, 382 [260 P.2d 1]; *People v. Bernard* (1946) 28 Cal.2d 207, 214 [169 P.2d 636].)" (*People v. Mendoza* (2000) 23 Cal.4th 896, 908–909 [98 Cal.Rptr.2d 431, 4 P.3d 265], first italics added.)

Here, the evidence does *not point indisputably* to murder in the perpetration of a robbery. The majority considers the defense evidence in isolation (struggle; victim shot at close range) and concludes it is insufficient to support a lesser-included second degree murder instruction. (Maj. opn., *ante*, at p. 116.) However, that evidence should be viewed together with the prosecution's case, which was far from compelling in establishing a capital felony-murder robbery.

Although the evidence shows that the victim cashed a $1,203 United States Treasury check two days before the murder, no evidence existed that the victim had the cash on him or that it was in the house when he was killed. Although the evidence showed that the victim said he was going to Mexico the next morning and was taking $3,000 with him, no evidence existed that defendant heard the victim's statement. Moreover, at the time of the statement, the room was filled with men who had been drinking alcohol, defendant was not situated next to the victim, and the television was on. Gerardo Macias testified that the victim made the statement directly to him,

but Arturo Vasquez testified that he did not hear it. Because the victim had been in his own house, the jury need not necessarily infer that he carried a wallet on him at the time of the killing. Presumably, an unemployed person, with the intent to kill for the purpose of robbery, would take everything of worth. Yet, when the body was found, the victim possessed $80 and jewelry. When arrested, defendant possessed $100 cash, not $1,203 or $3,000 cash. Three days after the arrest and four days after the killing, the police searched defendant's house. They did not find cash or any of the victim's personal property.

The prosecutor conceded at trial that defendant did not go to the victim's house to rob and kill him. Instead, the prosecution's theory was that defendant formed the intent to rob and kill while he was at the victim's house. The majority emphasizes the inference that defendant heard the victim boasting he was going to Mexico the next morning with $3,000. (Maj. opn., *ante*, at pp. 104–105.) Yet the prosecutor did not rely on that inference, apparently recognizing that it was not a particularly compelling one. Instead, she argued that, because the police did not find a wallet, money, a driver's license, an ATM card, plane tickets, a bank savings book, or the victim's gun on his person or in his house, the jury could infer that defendant took *something* from the victim. The prosecutor argued: "I don't think [defendant] went over there to kill him, but he saw the opportunity and he did. He saw maybe money on the ground. He saw maybe—maybe he only wanted the gun, and the fight was on for the gun, and in order to get away with the robbery, he shot and killed [the victim]. And [the victim], in his last breaths of life, ran after that defendant, ran down the street dying, trying to do what? Get—retrieve the property that was taken from him by the [defendant.]" However, no evidence existed that any of the enumerated items, except for the gun, was on the victim's person or in the house at the time of the killing. No evidence existed that the victim ran after defendant to retrieve his property. Thus, the evidence raises the question whether all of the elements of robbery felony murder were present. (*Breverman, supra,* 19 Cal.4th at p. 154.)

Was there evidence that the offense might have been less than first degree felony murder? (See *Breverman, supra,* 19 Cal.4th at p. 154.) The majority answers no, asserting that " '[a]ll the evidence points to robbery as the motive for the killing[]' . . . ." (Maj. opn., *ante,* at p. 117.) I disagree. Robbery—as the motive for the killing—may be a reasonable inference from the evidence, but certainly not a compelling one or the only one. Unlike the situation between two strangers in which robbery may be the only inferable motive for a homicide, the relationship between defendant and the victim presented other possible motives. Defendant and the victim knew each other. The evidence showed that the victim ordered defendant out of his house in a "kind of mad" tone and that they argued. Only one expended cartridge casing was found in the house, consistent with a struggle and shooting that may have started in the

house and continued outside. Indeed, Vasquez and Rigoberto Perez—upon seeing the blood inside the house—believed that the victim had shot defendant.

Moreover, the majority seems to suggest that, because the evidence reveals no explanation or reason for the shooting other than robbery, a second degree murder instruction was not warranted. However, motive is *not* an element of murder. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187, subd. (a).) "Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. ([Pen. Code,] §§ 187, subd. (a), 189; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102 [13 Cal.Rptr.2d 864, 840 P.2d 969].)" (*People v. Hansen* (1994) 9 Cal.4th 300, 307 [36 Cal.Rptr.2d 609, 885 P.2d 1022].) "Malice may be either express or implied. It is express when the defendant manifests 'a deliberate intention unlawfully to take away the life of a fellow creature.' ([Pen. Code,] § 188.) It is implied . . . 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]." (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666].) "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*People v. Hillhouse, supra,* 27 Cal.4th at p. 504; see *People v. Nabayan* (1969) 276 Cal.App.2d 361, 367 [80 Cal.Rptr. 779] [malice, in support of second degree murder conviction, inferred from circumstances of killing despite lack of evidence of motivation or reason for defendant to murder victim].)

Even if the jury had a reasonable doubt whether defendant killed the victim to rob him, the evidence amply supports a murder conviction. The evidence indisputably shows that someone—and the jury found that someone was defendant—shot the victim four times in the head and upper body at close range. A jury may reasonably infer that when someone shoots a person four times at close range, that person intends to kill, i.e., acts with express malice. At the least, the jury may find implied malice. "[I]t would seem obvious the intentional firing of a gun at the victim at close range is an act dangerous to human life and presents a high probability of death." (*People v. Woods* (1991) 226 Cal.App.3d 1037, 1048 [277 Cal.Rptr. 269].)[3]

---

[3] Pointing out the lack of mitigating evidence, the prosecutor argued, "The killing was unlawful. There's no evidence presented to you of any justification for murdering this man.

The majority relies on *People v. Wilson* (1992) 3 Cal.4th 926 [13 Cal.Rptr.2d 259, 838 P.2d 1212], a case somewhat similar to this case: the defendant knew the victim, and the victim's body was discovered with no wallet, a $20 bill in the rear pocket, and the pants pocket turned inside out. (Maj. opn., *ante*, at p. 117.) However, the differences outweigh the similarities. Unlike the present case, in *Wilson*, the prosecution's case regarding the robbery murder was strong: the defendant made incriminating statements— both before and after the killing—reflecting that he wanted to kill and did kill the victim for his money; the defendant acted nervously when the victim's death was being discussed; the victim was last seen with the defendant at a gas station purchasing gas for his van and carrying a wallet attached to his belt; and the victim was discovered shot in his van containing the defendant's clothes, and there was no evidence of forced entry. Moreover, the defendant explained that he had left some money on the victim so that the killing would not appear related to a robbery, and then took the remaining money and fled. We held that the trial court's failure to instruct on second degree murder was not error; the evidence was inconsistent with the defendant's factual claim that another person took the wallet after the defendant killed the victim or that the victim was not carrying a wallet or cash when he was shot. (*People v. Wilson, supra,* 3 Cal.4th at pp. 940–941.)

No such inconsistency appears in this record. A jury could reasonably conclude that defendant fatally shot the victim, but have reasonable doubts as to whether he robbed him or killed him for the purpose of robbing him.

## II. PREJUDICIAL ERROR

In addition to the all-or-nothing instructions on the charged offense, the jury was not provided with the noncapital option of first degree murder *without* special circumstances. In defining first degree felony murder, the trial court instructed that "the killing occurred during the commission or attempted commission of a robbery." It further instructed that, "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime." In instructing the jury on the robbery-murder special-circumstance allegation, the trial court gave an incomplete version of CALJIC No. 8.81.17, which essentially mirrored the first degree felony-murder instructions: "The murder was committed while the defendant was engaged in the commission of a robbery." Omitted from the special circumstance instruction was the following language: "The murder was committed in order to carry out or advance the commission of the [robbery] or to facilitate the

There was no evidence of self-defense, there's no evidence he was trying to kill somebody else, there's no evidence that it was a lawful killing."

escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [robbery] was merely incidental to the commission of the murder." Thus, the jury was not told that, to find the special circumstance allegation true, it must find defendant killed for the purpose of robbery. To make matters worse, the prosecutor told the jury during argument that there was no difference between the first degree felony-murder charge and the robbery-murder special-circumstance allegation.

Although the jury found true the special circumstance allegation that defendant committed the murder while "engaged in the commission of the crime of robbery," that finding *necessarily* flowed from the murder conviction, because the only basis for finding murder was a robbery felony murder. In other words, once the jury returned a guilty verdict of robbery felony murder, no reasonable jury could find not true the robbery-murder special circumstance; the felony-murder and special circumstance instructions essentially duplicated each other. Because incomplete special circumstance instructions were given, it cannot be said that "the factual question posed by the omitted [second degree murder] instruction was necessarily resolved adversely to the defendant under *other, properly given instructions.*" (*People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], italics added.)

In explaining why lesser included offenses are important in capital cases, the high court stated: " '[I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction.' " (*Beck v. Alabama* (1980) 447 U.S. 625, 634 [65 L.Ed.2d 392, 100 S.Ct. 2382].)

With the all-or-nothing instructions here, defendant was exposed to the " 'substantial risk that the jury's practice will diverge from theory.' " (*Beck v. Alabama, supra,* 447 U.S. at p. 634.) The risk was further amplified by the fact that the jury did not hear all the evidence that supported the defense. In support of his attack on the police investigation, defendant sought admission of evidence that one of the persons discovered in the back alley (Liberato Gutierrez) was arrested, had blood on him, and seemed nervous during his

encounter with the police. (Maj. opn., *ante*, at pp. 106–109.) Defense counsel argued, " 'The purpose, your honor, is that you have a very serious matter, you have a murder investigation that's going on. You have footprints that have been established by shoes, not by [feet] but by shoes. . . . You have an individual who has blood on his shirt, there is—the testimony will be that the blood has not been analyzed.' " (Maj. opn., *ante*, at p. 107.)

In responding to the defense offer of proof, the prosecutor never countered that the blood on Gutierrez's shirt or shoes had, in fact, been analyzed. Moreover, the Attorney General conceded at oral argument that the record fails to indicate that the blood was examined. The trial court denied the defense request, determining that the " 'probative value of that testimony is outweighed by the necessity of the undue consumption of further time. It would create a substantial danger of *confusing the issues and of misleading the jury.*' " (Maj. opn., *ante*, at p. 108, italics added.) Not entirely consistent with the denial ruling, the court admitted evidence that the police detained and interviewed several people in the alley behind the victim's house, impliedly finding that evidence relevant to the defense.

Contrary to the trial court's finding, evidence that a man with blood on his clothes found behind the house soon after the murder and the police's failure to test that blood went to the heart of the defense. The defense was to put the People to its proof. During closing argument, defense counsel argued that the prosecution failed to prove, beyond a reasonable doubt, that defendant killed *or* robbed the victim, or that a robbery even occurred. A recurring defense theme throughout argument was that the police's investigation was woefully inadequate, that other people had the opportunity to commit either the killing or a robbery, and that the police failed to investigate those possibilities. Without the blood evidence, defense counsel could only make the diluted argument that the police failed to conduct a shoe print analysis of the shoes worn by the people in the back alley. In my view, evidence that a man with blood on his clothes found behind the house soon after the murder could raise a reasonable doubt as to whether defendant robbed the victim. The victim was found dead *outside* near his house. After discovering the victim lying bloodied on the ground, Vasquez, Macias, and Perez abandoned him, leaving him alone for a period of time before the police arrived. No direct evidence was presented that the same person both shot *and* robbed the victim. Given the disputable nature of the robbery evidence, the excluded Gutierrez evidence could have added to any reasonable doubts the jurors may have had on the first degree murder charge.[4]

---

[4] The majority finds that the evidentiary issue was waived because defendant failed to present to the trial court the third party culpability claim that he now asserts. (Maj. opn., *ante*, at p. 109.) I disagree. In finding waiver, the majority focuses on defendant's third party claim that specifically targets Gutierrez as the possible killer. However, defendant also argues third

The prosecution had the burden to prove defendant guilty of robbery felony murder beyond a reasonable doubt. Defendant was entitled to be found guilty of no more than second degree murder if the jury had a reasonable doubt as to whether the prosecution met its burden of proving that defendant robbed the victim. (See CALJIC No. 8.71.) However, the jury's options were severely restricted. (*People v. Barton, supra,* 12 Cal.4th at p. 196 [jury denied opportunity to decide whether the defendant was guilty of lesser included offense established by evidence].) Under the circumstances of this case, I find a reasonable probability the verdict would have been different had the errors not occurred. (*Breverman, supra,* 19 Cal.4th at pp. 164–169, 178.)

Accordingly, I would reverse the guilt judgment and remand the case to give the People the option of retrying defendant or accepting a second degree murder conviction.

Kennard, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied February 24, 2004. Kennard, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.

---

party culpability in the general sense: There was reasonable doubt regarding defendant's culpability because the preferred evidence showed that someone else (*including* Gutierrez and not just defendant) had the opportunity to kill and/or rob the victim. That appellate argument appears to be consistent with the one made by defense counsel at trial. Although trial counsel said that he was not specifically targeting Gutierrez as the killer, he argued that the police failed to adequately investigate evidence which could incriminate someone else, such as the blood on Gutierrez or the shoe impressions of Vasquez and Perez. (Maj. opn., *ante,* at p. 107.) Counsel further argued to the trial court: " 'There are all important issues that raise issues of reasonable doubt as to whether . . . [defendant] performed this act in this crime.' " (Maj. opn., *ante,* at pp. 106–107.)

Thus, I agree that defendant has waived the claim that he was denied the right to present evidence to support a defense that Gutierrez specifically committed the crimes. But he has not waived the claim that the trial court improperly denied him the right to present evidence attacking the adequacy of the police investigation to establish reasonable doubt. In any event, we can decide the latter issue sua sponte since defendant presented that theory to the trial court.